**Del ACKELS, et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; William K. Reilly, Respondents.**

No. 92–70239.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1993.

Decided Oct. 14, 1993.

Rosalie A. Rybacheck, pro se, for petitioners.

Robert John, Fairbanks, AK, for amicus miners.

James W. Rubin, U.S. EPA Defense Section Dept., Washington, DC, for respondents.

Before: SCHROEDER, FLETCHER, and ALARCON, Circuit Judges.

## INTRODUCTION

SCHROEDER, Circuit Judge:

Petitioners Del Ackels, Stanley C. Rybachek, Rosalie A. Rybachek, Glenn Bouton, Donald Stein, Lela Bouton, and Richard Geraghty, are individual miners who have engaged in gold placer mining in Alaska. They filed this petition pro se asking us to review permits issued to them by the Environmental Protection Agency. The permits are National Pollutant Discharge Elimination System (NPDES) permits issued under the authority of the Clean Water Act, 33 U.S.C. §§ 1251–1387, pursuant to the regulatory framework established by the EPA. The permits impose effluent limitations, including numerical limits for specific pollutants in the discharge, and require specific technological practices miners must follow.

This court first considered NPDES permits for placer miners in *Trustees for Alaska v. EPA*, 749 F.2d 549 (9th Cir.1984). The opinion in that case described the sluicing process used to remove gold from "placers," which are alluvial or glacial deposits containing gold particles. This sluicing process results in the discharge of waste water which, if untreated, can create a serious environmental hazard to wildlife, particularly in the case of larger placer mining operations.

The permits we reviewed in *Trustees* were permits issued in 1976 and 1977. The permits we review here were issued in 1984, 1985 and 1987. The petitioners have demonstrated persistence, patience and perspicacity in pursuing their available remedies through a maze of regulatory procedures which brought them to this court after eight years of administrative appeals.[1] They argue ef-

1. The NPDES permit procedures are codified at 40 C.F.R. parts 122–36. EPA issues new or modified permits to individual applicants after public notice and opportunity for public comment. 40 C.F.R. §§ 122.21, 122.62, 124.3, 124.-

10. If a hearing is requested or if the Regional Administrator finds there is a significant degree of public interest, EPA may hold a hearing prior to issuing the permits. *Id.* § 124.12. Once EPA issues final permits, an interested party may re-

fectively that the administrative framework is unduly burdensome and attenuated. Their challenges in this proceeding, however, are not to the regulatory system the EPA has established under the Clean Water Act, but to the substantive requirements that the EPA has imposed upon them in the NPDES permits. It is those substantive provisions which we must address.

The principal challenges are to the permit limitations on arsenic and turbidity. A third challenge is to the requirement that the miners monitor for settleable solids once each day of discharge, not once each day of sluicing.

Plaintiffs also challenge certain aspects of the State of Alaska's certification procedures. The Clean Water Act requires EPA to submit proposed permits to the appropriate state agency so that the state may certify that the permits are sufficiently strict to ensure compliance with state law water quality standards. There are in addition a number of challenges to the procedures the EPA followed in issuing permits. There are, finally, a number of issues raised that are moot or outside the jurisdiction of this court to consider.

We deal with each category in turn.

### EFFLUENT LIMITATIONS: TURBIDITY AND ARSENIC

*Turbidity*

The original turbidity standard adopted by the EPA in the 1970s used the state water quality standard, measured 500 feet downstream. We held in *Trustees* that that standard was not sufficient to comply with the Act, and that the EPA was required to establish end-of-pipe effluent limitations for turbidity necessary to achieve state water quality standards. *See* 749 F.2d at 556–57.

In response to the *Trustees* decision, the EPA modified the 1985 permits to include end-of-pipe effluent limitations for turbidity of 5 NTUs[2] above background, which is the Alaska water quality criteria. Accordingly, these permits provide that the state water quality criteria must be satisfied at the point of discharge.

Petitioners administratively challenged this limitation contending that the EPA should not have used the state water quality standard, but instead should have translated the turbidity standard into an effluent limitation for settleable solids by volume. They contended that the end-of-pipe effluent limitation for turbidity is not appropriate because turbidity is unstable and the permit limitation is not economically obtainable.

The Regional Administrator granted a hearing on this issue, and the ALJ found that the limitation was reasonable. The Administrator then denied review of this issue and the petitioners now challenge that decision.

■ The issue is whether the decision is supported by substantial evidence, and the record reflects that it is. *See Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1266 (9th Cir. 1977). Testimony introduced by both parties showed that turbidity, a measure of the water's cloudiness or the ability of water to scatter light, has little relationship to either the settleable solids or suspended solids at the NTU level in question. Organic matter as well as silt, minerals and metals affect turbidity. Therefore it is not feasible to control turbidity by limiting suspended or settleable solids. The EPA correctly established a direct effluent limitation for turbidity. Further, there was evidence that there were technologies capable of meeting the turbidity limitation. Regardless of that fact, the limitation is necessary to comply with state water quality standards, and the Clean Water Act requires the permits to meet the state water quality standards. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1313(c)(2). Accordingly,

quest an evidentiary hearing. *Id.* § 124.74. If the request for a hearing is granted, the hearings are conducted by an Administrative Law Judge. *Id.* § 124.81. A party may appeal the ALJ's decision, or the denial of a hearing request, to the Administrator. *Id.* § 124.91. An appeal to the Administrator is a prerequisite for judicial review. *Id.* § 124.15. The Administrator's decision denying review or on the merits constitutes final agency action. *Id.* § 124.91(e).

2. Nephelometric turbidity units.

the economic and technological restraints are not a valid consideration.

*Arsenic*

Arsenic often occurs naturally in the soil in conjunction with gold in glacial placer deposits. When the miners complete their sluicing process, this arsenic is released in the wastewater. As with turbidity, the Act requires that the permit limitations meet state water quality criteria for arsenic. Petitioners' principal argument is that the EPA misinterpreted the state standard to require that the streams used in mining must be clean enough to provide a source of drinking water. The petitioners contend that the Alaska drinking water standard applies only to water that has already been treated for public distribution as drinking water.

The petitioners' reading of the Alaska water quality criteria is too strained for us to accept. The Alaska Water Quality Standards provide that "toxic and other deleterious organic and inorganic substances" in Alaska's water supply "shall not exceed Drinking Water Standards (18 AAC 80) or EPA Quality Criteria for Water ... as applicable to substance." Alaska Admin.Code tit. 18, § 70.020. The Alaska Drinking Water Standards in turn provide that the maximum contaminant concentration for arsenic in public water systems is 0.05 mg/l, *id.* § 80.-050(a)(1), and this is the limit EPA included in the permits.

■ Petitioners contend that the language in the Water Quality Standards mandates a choice between two different Drinking Water Standards sections, section 80.020 and section 80.050. According to petitioners, section 80.050 is applicable only to water that has already been treated for public distribution as drinking water and does not apply to their discharge. Petitioners contend that section 80.020 applies to their discharge and does not contain any specific numerical limit for arsenic.[3] The ALJ and the Administrator correctly rejected the petitioners' proposed reading of the water quality statutes. The statutes provide that when establishing a water quality standard for a particular toxic substance, one must find the numerical standard applicable to that substance in section 80.050. This is exactly what EPA did in establishing the effluent limitations and this interpretation of state law is reasonable and entitled to deference. *See Arkansas v. Oklahoma,* —— U.S. ——, ———— ——, 112 S.Ct. 1046, 1058–59, 117 L.Ed.2d 239 (1992).

■ Petitioners also challenge the permit conditions regarding arsenic on the grounds that: (1) EPA failed to hold a hearing as mandated by this court in *Trustees,* and (2) the permits required improper procedures for testing for arsenic. These contentions lack merit.

In *Trustees,* we held that EPA was at a minimum required to hold a hearing on whether the permits should include limitations for arsenic, because evidence showed that arsenic posed an environmental problem. 749 F.2d at 556–57. By modifying the permits regarding arsenic, EPA went beyond this court's minimum requirement and took action to address the problem with which we were concerned. The miners then had a full evidentiary hearing before the ALJ on the issue of arsenic.

With respect to the testing procedures for arsenic required in the permits, the procedure is established by 40 C.F.R. pt. 136. The EPA correctly imposed this procedure in the permits.

## FREQUENCY OF MONITORING

■ Section 308 of the Act grants EPA broad authority to require NPDES permitees to monitor, at such intervals as the Administrator shall prescribe, whenever it is required to carry out the objectives of the Act. 33 U.S.C. § 1318; 40 C.F.R. § 122.48. Petitioners contend that the Administrator erred by upholding the permits' requirement that discharge be monitored for settleable solids once per day of discharge instead of once per day of sluicing. The Administrator's decision that monitoring should take

---

**3.** Section 80.020 provides: "Source Protection. No person may cause pollution or contamination to enter a public water system, or create or maintain a condition which has a significant potential to cause pollution or contamination of a public water system."

place once per day of discharge, however, is supported by substantial evidence. Petitioners contend that the provision will require them to remain at their sites to monitor discharge even during periods of inactivity and the off-season. The Administrator's decision did not so interpret the permits. Rather, monitoring is required only when there is discharge attributable to the existence of the mining operation. As explained in the Regional Administrator's Comments, this requirement is intended to encourage the operators to design their operations so that during periods of inactivity, there will be no discharge. The petitioners have not demonstrated that this requirement is unreasonable. Although they point to evidence in the record that monitoring once per day of sluicing was sufficient, the complete testimony was that such monitoring would be adequate only if the "mining operation had reached equilibrium," so that discharge occurred only when sluicing operations were taking place. Under these permits, the miners are permitted to monitor only when sluicing operations are taking place, provided that they have taken adequate safeguards to ensure that no discharges occur on any other days.

## STATE CERTIFICATION ISSUES

■ Petitioners raise several challenges to the State's certification of the permits. Under the Act, EPA is required to submit proposed new or modified permits to the state for certification, and the state has authority to impose any more stringent terms or conditions necessary to ensure that the permits will meet state law water quality standards. Petitioners first contend that the state did not complete its certification within 60 days as required by 40 C.F.R. § 124.53(c)(3) and therefore the state's certification is invalid. Section 124.53(c)(3) provides that the state will be deemed to have waived its right to certify unless it exercises that right within 60 days. The Regional Administrator, however, may authorize a longer period upon finding that unusual circumstances require a longer time. 40 C.F.R. § 124.53(c)(3). We conclude that under this provision, and given Congress' intent to encourage state certification in order to protect the nation's waterways through a dual federal and state permitting process, EPA had discretion to accept state certification beyond the 60–day period.

■ Petitioners claim the state failed to provide state law authority for its imposition of a more stringent settleable solids limit. We conclude that the state properly indicated that this limit was based on Alaska Admin.Code tit. 18, § 70.020, which is the provision of Alaska law governing water quality for sediment. We must also reject petitioners' contention that the state certification is invalid because the state did not indicate which permit conditions could be made less stringent. This does not invalidate the certification but merely waives the State's right to object to any conditions subsequently made less stringent. 40 C.F.R. § 124.-53(e)(3).

■ Petitioners also contend that when the state added the settleable solids limitation to the modified 1985 permits, EPA was then required to issue new draft permits because EPA had only noticed the permits for modification for turbidity and arsenic. Although the petitioners are correct that "when a permit is modified, only the conditions subject to modification are reopened," in this case the new conditions were added by the state, not EPA. EPA was required to forward the entire permit to the state, not merely the modified conditions, and once the state added the additional conditions, EPA was required to incorporate those conditions into the final permit and lacked authority to reject them. 33 U.S.C. § 1341(a); 40 C.F.R. § 124.53(a). Petitioners' only recourse is to challenge the state certification in state judicial proceedings. Miners Advocacy Council, amicus herein, has already litigated the validity of the State's certification of the modified 1985 permits, and lost. *See Miners Advocacy Council, Inc. v. Alaska Dep't of Envtl. Conservation,* 778 P.2d 1126, 1135 (Alaska 1989).

## CHALLENGES TO ISSUANCE PROCEDURES

■ Petitioners challenge certain procedures EPA followed in issuing these permits. First, petitioners challenge the issuance of

identical permits and contend that EPA must issue permits on a case-by-case basis and provide site-specific review. Petitioners' primary complaint here is that EPA should not have included the 0.2 ml/l limitation for settleable solids in all the 1985 and 1987 permits but should have calculated this limit on an individual basis. In 1988, however, the EPA promulgated national effluent guidelines establishing a 0.2 ml/l settleable solids limitation for the placer mining industry. 40 C.F.R. § 440.140–48. Thus, this issue is moot. Further, because EPA is not subject to the requirements of the Alaska Administrative Procedure Act, we must reject petitioners' claim that the issuance of identical permits constituted promulgation of a regulation in violation of the Alaska APA. *See Miners Advocacy Council,* 778 P.2d at 1135. Finally, the record shows that at least with respect to turbidity, individual applicants were allowed to present site-specific evidence and were issued modified permits on that basis.

■ Petitioners also claim that EPA erred by requiring them to comply with contested permit conditions while they challenged the permits through administrative and judicial appeals. This challenge is not to the permits, which we review, but to enforcement. To the extent petitioners challenge EPA's enforcement of contested conditions, they should do so as a defense to any enforcement proceedings in district court under section 309 of the Act, 33 U.S.C. § 1319(a), (b).

■ Petitioners also claim inadequate notice of enforceable conditions. Applicable administrative procedures provide for staying contested permit conditions during administrative appeals. *See* 40 C.F.R. § 124.60(c)(1). The record shows that EPA gave petitioners notice of uncontested conditions and contested, stayed conditions. EPA lacks authority to stay conditions imposed by state certification. Thus, petitioners' claims regarding notice of enforceable conditions lack merit.

■ Petitioners also contend that they were prejudiced because, when they requested a hearing on issuance procedures for the 1985 permits, the Regional Administrator de-nied a hearing yet the published notice erroneously included issuance procedures as one of the issues granted for hearing. Assuming arguendo the issue is not moot, we agree with the ALJ that because the miners had correct, individual notice of those issues denied for hearing and effectively appealed those issues, the error in the published notice was not prejudicial.

## OTHER CLAIMS THAT ARE MOOT

The 1985 and 1987 permits which the petitioners challenge in this proceeding have all expired. While the challenges to permit terms and conditions discussed above fall within the exception to the mootness doctrine because they are capable of repetition yet evading review, *see Trustees,* 749 F.2d at 555, petitioners' challenges to other permit terms are now moot because those terms are not likely to be imposed in subsequent permits. *See id.*

■ Petitioners contend that the Administrator erred by upholding EPA's prohibition of a mixing zone for arsenic. A mixing zone is an area in which pollutant concentrations exceed water quality standards before they are sufficiently diluted by the receiving body of water. *See Marathon Oil Co. v. EPA,* 830 F.2d 1346, 1349 (5th Cir.1987). The Alaska regulation applicable to mixing zones in effect at the time EPA issued these permits provided that mixing zones could be allowed for toxic substances unless there is "a significant potential for adverse environmental or health effects." Alaska Admin.Code tit. 18, § 70.032(a) (1987). Alaska subsequently amended its mixing zone regulation to eliminate the requirement of a showing of a significant potential for adverse environmental or health effects. *Id.* (1991). Because of the effect of this amendment, the Administrator correctly concluded that the petitioners' request that the permits include a mixing zone for arsenic was moot. *See Trustees,* 749 F.2d at 555.

Petitioners also challenged the fact that the permits did not allow discharge from hydraulic removal of overburden. Hydraulic removal of overburden is the use of highly pressurized water to break up and wash

away the surface layer of vegetation and earth to expose the gold-bearing placer deposits beneath. Petitioners challenged this same issue in the 1991 permits, and EPA's Environmental Appeals Board ruled that EPA must address a miner's entire process in a single permit if a permit applicant so requests. *In re Miners Advocacy Council,* NPDES Appeal No. 91–23 (Sept. 3, 1992). EPA then notified 1991 permit applicants that they would be allowed to seek modifications of their permits to include discharges from hydraulic removal of overburden. Thus, petitioners' challenge to this term in the 1987 permits is moot because this condition will not be imposed in future permits. *See Trustees,* 749 F.2d at 555.

### CLAIMS OUTSIDE THE JURISDICTION OF THIS COURT

Petitioners raise several claims which we lack jurisdiction to consider. We address each in turn.

First, petitioners contend that EPA improperly issued section 309 consent orders. Section 309 of the Act authorizes EPA to issue compliance orders or commence a civil action in federal district court requiring those in violation of their NPDES permits to comply with their permits. 13 U.S.C. § 1319(a), (b). Section 509 of the Act provides jurisdiction in the courts of appeals to review certain orders of EPA under the Act. 33 U.S.C. § 1369(b). Section 509 does not provide for review in the courts of appeals of section 309 compliance orders. Because section 509 is the only source of appellate jurisdiction to review EPA orders, and given the specificity of the review provisions listed in section 509, we conclude that we lack jurisdiction to review petitioners' claims regarding the terms or conditions of the section 309 orders. *See City of Baton Rouge v. EPA,* 620 F.2d 478, 480 (5th Cir.1980). Petitioners' recourse is to challenge these orders in federal district court proceedings. This court would then have jurisdiction to review the final decision of the district court. *See id.* at 480 n. 3.

Second, petitioners contend that the NPDES permit conditions result in a taking

of property without compensation in violation of the Fifth Amendment. Section 509, however, does not provide jurisdiction in the courts of appeal to review takings claims. *Rybachek v. EPA,* 904 F.2d 1276, 1300–01 (9th Cir.1990). Rather, Congress has provided for concurrent jurisdiction over takings claims in the Claims Court and the federal district courts. 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Thus, we lack jurisdiction to hear this claim.

Finally, petitioners ask us to review the National Effluent Guidelines and Standards applicable to the placer gold mining industry. The EPA promulgated these guidelines on May 24, 1988. 40 C.F.R. § 440.140–48. Several miners and the Alaska Miners Association petitioned for review of these guidelines, and in an extensive opinion, this court addressed their challenges and upheld the regulations. *Rybachek,* 904 F.2d 1276. Petitioners now seek to challenge anew the promulgation of the National Guidelines. Petitioners' attempt to challenge the guidelines is time-barred because they did not file their petition for review within 120 days of the promulgation of the guidelines. *See* 33 U.S.C. § 1369(b). Accordingly, we will not revisit this issue.

### CONCLUSION

For the foregoing reasons, this court is not in a position to modify these permits or order further administrative proceedings on the basis of these challenges, which petitioners have ably pursued and presented. The petitions for review must be DENIED.