**CITIZENS FOR A BETTER ENVIRONMENT–CALIFORNIA, San Francisco Baykeeper, Save San Francisco Bay Association, The Bay Institute of San Francisco, Santa Clara Valley Audubon Society, Kalon Wofford and Anthony Willis, Plaintiffs–Appellees,**

v.

**UNION OIL COMPANY OF CALIFORNIA, a corporation, Defendant–Appellant.**

No. 95–15139.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1996.

Decided May 13, 1996.

As Amended July 16, 1996.

Linda M. Dardarian (argued), Jollee Faber, Saperstein, Goldstein, Demchak & Baller, Oakland, California, for plaintiffs-appellees.

Sanford Svetcov (argued), Landels, Ripley & Diamond, San Francisco, California, for defendant-appellant.

Tseming C. Yang (argued), United States Department of Justice, Washington, D.C.; John P. Dyer, Boalt Hall School of Law, University of California, Berkeley, California, Board of Supervisors of the City and County of San Francisco; City Councils of the Cities of Richmond, Martinez, and Albany; The Board of Directors of the East Bay Regional Park District; George Miller and Ronald V. Dellums, Members of Congress; Members of the California Assembly Robert Campbell (11th District), Tom Bates (14th District), and Barbara Lee (16th District); and Norman Laforce in his capacity as Mayor of the City of El Cerrito; Stephan C. Volker, Sierra Club Legal Defense Fund, San Francisco, California; Barry S. Neuman, Jenner & Block, Washington, D.C.; American Petroleum Institute and The Chemical Manufacturers Association; Craig E. Stewart, Pillsbury Madison & Sutro, San Francisco, California, Exxon Corporation and Western States Petroleum Association; Edward J. Casey, McClintock, Weston, Benshoof, Rochefort,

Rubalcava & Maccuish, Los Angeles, California, California Chamber of Commerce and California Council for Environmental and Economic Balance; Scott M. DuBoff, Wright & Talisman, P.C., Washington, D.C., American Automobile Manufacturers Association, The Chamber of Commerce of the United States of America, National Association of Manufacturers, ACME Metals, Inc., Coats America, Inc., Crucible Specialty Metals, Cyprus–AMAX, Inc., Dresser Industries, Inc., General Electric Co., Murphy Oil USA, Inc., PMC, Inc., Total Petroleum, Inc., U.S. Steel Group, and Zeneca, Inc.; Charles S. Treat, Latham & Watkins, San Francisco, California, 28 California Cities and Towns; Charles C. Caldart, David A. Nicholas, Joshua R. Kratka, National Environment Law Center, California Public Interest Research Group, Illinois Public Interest Research Group, Massachusetts Public Interest Research Group, Public Interest Research Group in Michigan, Public Interest Research Group of New Jersey, Ohio Public Interest Research Group, and Washington Public Interest Research Group, Boston, Massachusetts, for amici curiae.

Stephan C. Volker, Sierra Club Legal Defense Fund, attorney for Amici Curiae Sierra Club, Hudson Riverkeeper Fund, Inc., Natural Resources Defense Council, Atlantic States Legal Foundation, Earth Island Institute, Clean Water Action, United Anglers of California, Marin Audubon Society, Golden Gate Audubon Society, Peninsula Conservation Center Foundation, Petaluma River Council, Pacific Coast Federation of Fishermen's Associations, ARC Ecology, Citizens for the Eastshore State Park, Ohlone Audubon Society, Inc., Mount Diablo Audubon, Madrone Audubon Chapter, Committee to Save the Mokelumne, California Sportfishing Protection Alliance, Coastal Advocates, Santa Monica Baykeeper, San Diego Baykeeper, Surfers Environmental Alliance, Hawai'i's Thousand Friends, The Hawai'i–la Ieikawai Association, Inc., Puget Soundkeeper Alliance, Northwest Environmental Advocates, Tualatin Riverkeepers, Delaware Riverkeeper Network, New York/New Jersey Harbor Baykeeper, Friends of Santa Fe County, and New Mexico Environmental Law Center.

Before: BROWNING and JOHN T. NOONAN, Jr., Circuit Judges, and MERHIGE, Senior District Judge.*

MERHIGE, Senior District Judge:

This case arises under the federal Water Pollution Control Act (the "Clean Water Act"), 33 U.S.C. § 1251, *et seq.* The Appellees, Citizens for a Better Environment, et al. ("CBE"), brought this action in the federal district court for the Northern District of California pursuant to the citizen suit provision of that Act, 33 U.S.C. § 1365. In the Complaint, CBE asserted a claim for violations of the Clean Water Act effluent standards, a claim for violations of Clean Water Act water quality standards, and a state law claim. Although the district court granted the motion of the Appellant, Union Oil Company of California ("UNOCAL"), to dismiss as to the water quality standards claim, the district court denied UNOCAL's motion to dismiss, premised on 33 U.S.C. § 1319(g)(6)(A)(ii) and (iii), as to the effluent standards claim and the dependent state law claim. The district court certified its order denying UNOCAL's motion to dismiss for immediate appeal pursuant to 28 U.S.C. § 1292(b).

**I.**

The Clean Water Act regulates the discharge of pollutants into navigable waters. The Act prohibits all discharge of pollutants except inasmuch as one of several enumerated statutory exceptions applies. 33 U.S.C. § 1311(a). One such exception is where the polluter has been issued a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. The effluent discharge standards or limitations specified in an NPDES permit define the scope of the authorized exception to the prohibition in

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

§ 1311(a). Authority to administer the NPDES permit system may be delegated to a state or regional agency where the state or regional regulatory scheme meets certain criteria. 33 U.S.C. § 1342(b). The entity responsible for issuing permits in the San Francisco Bay area of California is the California Regional Water Quality Control Board, San Francisco Region (the "Regional Board"). Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).

UNOCAL owns and operates a petroleum refinery in the San Francisco Bay area of California. Wastewater from the refinery is subject to UNOCAL's NPDES permit issued by the Regional Board. On February 20, 1991 the Regional Board issued Order No. 91–026, which amended the UNOCAL's NPDES permit for the San Francisco Bay area refinery. The order set a "final" concentration limit on selenium discharges of 50 parts per billion ("ppb") and a mass emission rate of .85 pounds per day, calculated on a running annual average. The final selenium limitation was to take effect December 12, 1993. On June 16, 1991 the Regional Board issued Order No. 91–099 amending UNOCAL's NPDES permit to include an "interim limit" less stringent than the final limit which took effect immediately and which was to remain in force until the final limit came into effect. UNOCAL is in substantial compliance with the interim limit but is not in compliance with the final limit.

The Regional Board issued these orders pursuant to 33 U.S.C. § 1314(*l*) of the Clean Water Act, which required the Regional Board to adopt individual control strategies for discharges into waters determined by the United States Environmental Protection Agency ("EPA") or the state to be impaired. The Regional Board listed San Francisco Bay as a "hot spot" under § 1314(*l*) on the ground that it failed to meet the "applicable water quality standard" of the Clean Water Act "due entirely or substantially to discharges from point sources of any toxic pollutants." See 33 U.S.C. § 1314(*l*)(1)(B).

The state water board denied an appeal by UNOCAL and other refiners challenging the selenium discharge limits. Shortly thereafter, on October 12, 1992, UNOCAL and others filed a petition for a writ of mandate in the Solano County Superior Court of California seeking to set aside the interim and final limits on the grounds that the Regional Board's listing of the San Francisco Bay as a "hot spot" violated the Clean Water Act and its implementing regulations.

Over the course of 1993, UNOCAL and others were in settlement discussions with the Regional Board. Although other refiners in the area became able to meet the final limits, UNOCAL and other refiners maintained their inability, due to technological constraints, to meet the final selenium limits. On November 8, 1993, UNOCAL, along with other refiners, reached a settlement agreement whereby UNOCAL and others would dismiss the state lawsuit and the Regional Board would adopt a proposed cease and desist order ("CDO"). The parties dispute whether the settlement agreement and proposed CDO were released for public comment on November 9, 1993 or November 12, 1993. On November 19, 1993 and December 15, 1993 public hearings were held on the proposed CDO at which CBE participated. The Regional Board, with some minor modifications, issued the CDO on January 19, 1994 as Order No. 94–015.

The principal elements of the settlement agreement and the CDO were that UNOCAL and the other refiners dismissed their state court lawsuit without prejudice, UNOCAL and others paid the state a total of $2 million ($780,000 of which was contributed by UNOCAL), and the Regional Board issued the CDO which, among other things, relieves UNOCAL and others from meeting the final selenium limit until July 31, 1998. The CDO states, with respect to the latter element, that:

> Compliance with this Order shall be in accordance with the following tasks and time schedules:
>
> . . . .
>
> c. The dischargers shall implement a removal technology or technologies, or an alternate control strategy, which has been determined by the dischargers to be capable of achieving compliance with the discharge limitations as specified in [the NPDES permits] and shall comply with these limits, no later than July 31, 1998.

CBE filed this lawsuit on March 2, 1994. On July 8, 1994, the district court dismissed the water quality standards claim. The district court subsequently certified the question of its denial of the motions to dismiss as to the other claims for immediate appeal pursuant to 28 U.S.C. § 1292(b).

## II.

UNOCAL asserts two arguments as to why dismissal of the effluent standards claim is proper. First, UNOCAL argues that dismissal is warranted because the citizen suit is barred under § 1319(g)(6)(A)(ii) and § 1319(g)(6)(A)(iii). Second,—UNOCAL urges that dismissal for failure to state a claim is appropriate because the CDO issued by the Regional Board had the effect of extending until 1998 the deadline for complying with the final selenium limits specified in the NPDES permit and, thus, there is no effluent standards violation. The Court reviews each of these questions of law de novo. *Kruso v. International Tel. & Tel.*, 872 F.2d 1416, 1421 (9th Cir.1989).

### A. Is the Citizen Suit Barred Under 33 U.S.C. § 1319(g)(6)(A)(ii) or § 1319(g)(6)(A)(iii)?

33 U.S.C. § 1365 generally authorizes private citizens to sue those violating, among other things, "an effluent standard or limitation" under the Clean Water Act. 33 U.S.C. § 1319(g)(6) sets out certain instances where these citizen suits are barred. The provisions of § 1319(g)(6)(A) are precisely designed to preclude citizen suits which would be duplicative of an "administrative penalty action." *See Washington Public Interest Research Group v. Pendleton Woolen Mills*, 11 F.3d 883, 885 (9th Cir.1993).

The citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, provides, in relevant part:

> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—
>> (1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator [of the EPA] or a State with respect to such a standard or limitation. . . .

> The district courts shall have jurisdiction ... to enforce such an effluent standard or limitation, or such an order, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

33 U.S.C. § 1365(a).

Section 1319(g)(6) provides, in relevant part:

> [A]ny violation—
>> (i) with respect to which the Administrator [of the EPA] or the Secretary [of the Army] has commenced and is diligently prosecuting an action under this subsection,
>> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or
>> (iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

> shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A).

### 1. Applicability of § 1319(g)(6)(A)(iii)

§ 1319(g)(6)(A)(iii) precludes this citizen suit if the CDO at issue in this case is a "final order not subject to further judicial review," and if UNOCAL has paid a "penalty" that was "assessed under this subsection, or such comparable State law." Because UNOCAL has not paid a "penalty" "assessed under ... comparable State law" the Court concludes that CBE's suit is not barred by § 1319(g)(6)(A)(iii).

#### a. "penalty"

UNOCAL maintains that the $780,000 it paid to the Regional Board constituted a "penalty" within the meaning of § 1319(g)(6)(A)(iii). The district court concluded that the $2 million payment, of which UNOCAL's payment was a part, was not a penalty but "was simply settling the refiner-

ies' state court lawsuit." The district court noted that the CDO refers to a "payment" not a "penalty" and that the CDO clearly stated that it was issued pursuant to the Regional Board's authority under California Water Code § 13301, governing cease and desist orders. The district court also noted that in the CDO the Regional Board "expressly declined to invoke its [California Water Code] § 13385 authority" to impose a civil penalty.[1]

UNOCAL argues, essentially, that it has paid out over $780,000 (10% of which went into the California Water Pollution Cleanup and Abatement Account that is the repository of fines levied pursuant to § 13385, and 90% into a "Selenium Mitigation Fund")[2] and that it elevates form over substance to call this anything other than a "penalty."

In support of the formal reasoning of the district court, CBE asserts two additional reasons why UNOCAL may not characterize the payment as a penalty. First, UNOCAL itself insisted on characterizing the financial transfer as a "payment" and not a "penalty" at the time of the state action settlement. CBE notes that counsel for UNOCAL stated at the hearing on the motion to dismiss at the district court that UNOCAL would not, at the time of the settlement of the state lawsuit, "sign on to paperwork that characterized it as a penalty, because of the punitive and bad conduct implications that the general public takes from that term." CBE, appropriately, in the Court's view, argues that UNOCAL simply "cannot have it both ways" and that the fairest characterization of the $780,000 payment is that it was not a penalty but, instead, the price of avoiding the stigma of a formal enforcement action.

Second, CBE argues that there are other significant advantages that were obtained by UNOCAL by making a payment independent of the state statutory provision, California

Water Act § 13385, that is analogous to the administrative penalty provision of the Clean Water Act, 33 U.S.C. § 1319(g). California Water Code § 13385 sets out formal procedures to be followed and specific factors to be considered in setting a penalty. Thus, asserts CBE, by making a payment outside the context of § 13385, UNOCAL avoided a significant level of scrutiny as to the nature and amount of a penalty. For example, the United States, as *amicus curiae*, notes that there was no formal scrutiny of the economic benefits to UNOCAL of non-compliance and thus no assurance that UNOCAL has fully disgorged the benefit it receives from violating effluent standards. CBE also notes that while payment of an administrative penalty must be made within 30 days of being imposed, California Water Code § 13323(d), UNOCAL was not required to make half of its payment until a year after the settlement was entered into.

■ The Court determines that the fairest characterization of the payment at issue is that it was, indeed, a settlement made to avoid an enforcement action by the Regional Board. Accordingly, because UNOCAL has not paid a "penalty," the § 1319(g)(6)(A)(iii) bar to citizen suits does not apply. This conclusion that § 1319(g)(6)(A)(iii) is not implicated is buttressed by the Court's interpretation of the term "comparable state law," discussed below.

**b. "comparable state law"**

Having determined that the payment at issue was not a "penalty," the district court also concluded that the payment was not "assessed under this subsection, or such comparable State law" within the meaning of § 1319(g)(6)(A)(iii). It is undisputed that the penalty provision in § 13385 of the California Water Code is comparable to the federal

---

1. The CDO states, in part, that:
   [t]he Regional Board has considered the various enforcement and penalty options available to it regarding the violation [of the NPDES permit], including the issuance of a cease and desist order or a cleanup or abatement order, imposition of an administrative civil penalty and referral to the Attorney General for civil prosecution. Under the circumstances detailed in the Findings set forth above, the Re-

gional Board has determined that the most appropriate course of action is settlement of the litigation and issuance of a cease and desist order.

2. The Appellees argue, however, that this cuts against the Appellant because § 13385 requires all penalties to be paid into the California Water Pollution Cleanup and Abatement Account.

Clean Water Act penalty provision of 33 U.S.C. § 1319. It is also not disputed that the payment at issue in this case was not levied pursuant to California Water Code § 13385.[3] The key issue, therefore, is whether a penalty assessed not in accordance with § 13385 but, instead, under the aegis of a related provision of the California statutory scheme is "assessed under this subsection, or such comparable State law." UNOCAL argues, as it did in the district court, that although the CDO states that it was issued under the authority of California Water Code § 13301, because § 13301 is within the same statutory scheme as § 13385 a penalty assessed under the former provision is assessed under a "comparable State law" within the meaning of 33 U.S.C. § 1319(g)(6)(A)(iii).

The district court held that the "comparability assessment is conducted by examining the state statutory enforcement provision involved," here California Water Code § 13301, and "not the state statutory enforcement scheme as a whole." Because California Water Code § 13301 is not comparable to the federal penalty provision in 33 U.S.C. § 1319(g), reasoned the district court, a penalty assessed under § 13301 does not implicate the § 1319(g)(6)(A)(iii) bar on citizen suits. In reaching this conclusion the district court specifically rejected the reasoning of the First Circuit in *North and South Rivers Watershed Ass'n v. Scituate* interpreting the term "comparable" in § 1319(g)(6)(A)(ii). 949 F.2d 552, 555–556 (1st Cir.1991).

In *Scituate* the First Circuit held that the comparability requirement of § 1319(g)(6)(A)(ii) is met where the state "statutory scheme" contains a penalty provision comparable to the federal penalty provision and that a state's decision not to utilize the comparable state law penalty provision in any particular case does not negate the "comparability" of the state action. *Id.;* accord, *Arkansas Wildlife Federation v. ICI Americas, Inc.,* 29 F.3d 376, 382–383 (8th Cir.1994). The *Scituate* Court reasoned:

The State's decision not to utilize the penalty provisions does not alter the comparability of the State Act's statutory scheme to the scheme found in the Federal Act. While the specific statutory section under which the State issued its Order does not, itself, contain a penalty provision, another section of the same statute does contain penalty provisions. These two coordinate parts are cogs in the same statutory scheme implemented by the State for the protection of its waterways.

*Scituate,* 949 F.2d at 556, (internal citations omitted). Thus, "[i]t is enough that the [state] statutory scheme ... contains penalty assessment provisions comparable to the Federal Act, that the State is authorized to assess those penalties, and that the overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same goals." *Id.* Furthermore, according to the *Scituate* Court, "[s]o long as the provisions in the State Act adequately safeguard the substantive interests of citizens in enforcement actions, the rights of notice and public participation found in the State Act are satisfactorily comparable to those found in the Federal Act." *Id.*

In *Washington Public Interest Research Group v. Pendleton Woolen Mills* this Court interpreted the terms of 33 U.S.C. § 1319(g)(6)(A)(i). 11 F.3d 883 (9th Cir. 1993). The Court noted that § 1319(g) deals only with administrative penalty actions. *Id.* at 885. The Court then concluded that when determining whether the EPA was "diligently prosecuting an action under this subsection," the phrase "under this subsection" could mean only that the EPA was prosecuting an administrative penalty action. *Id.* at 886. The § 1319(g)(6)(A)(i) bar to citizen suits, therefore, was not implicated "in the face of an administrative compliance order." *Id.* The Court specifically noted that it was not persuaded by the reasoning underlying the *Scituate* Court's interpretation of § 1319(g)(6)(A)(ii) which was grounded in that court's concern that the discretion of enforcement authorities to choose enforcement methods be preserved. *Id.* This

---

**3.** Although the parties dispute the degree of similarity to the requirements of § 13385 of the procedures and factors that were actually taken and considered in this case, Appellant cedes that the specific requirements of § 13385 were not adhered to.

Court noted the language of the statute was clear and that there was no evidence in the legislative history that suggested that Congress intended to extend the bar on citizen suits to a context beyond administrative penalty actions. *Id.* at 885–886. This Court also noted that had Congress intended that administrative compliance orders preclude citizen suits, it could have done so—as it has in other instances. *Id.* at 886.

■ The Court concludes that the requirement in § 1319(g)(6)(A)(iii) that any penalty be "assessed under this subsection, or such comparable State law" before it precludes citizen suits means that the penalty at issue must have been assessed under that provision of state law that is comparable to § 1319(g). There are several reasons for this conclusion. First, this is the plainest reading of the statutory language.[4] Second, § 1319(g) mandates various public notice and comment procedures as well as penalty assessment factors. Unless any penalty is assessed according to the particular provision of state law that is comparable to § 1319(g), there is no guarantee that the public will be given the requisite opportunity to participate or that the penalty assessed is of the proper magnitude. Third, as noted by the United States in its amicus brief, the holding of *Scituate* leads to the anomalous conclusion that state administrative enforcement actions would more broadly preclude citizen suits than the administrative enforcement actions of the EPA. Nothing in the language and structure of the § 1319(g)(6)(A) in any way suggests that Congress intended such a dichotomy. Nor has the UNOCAL pointed to any legislative history that would indicate that Congress intended that state administrative actions be given broader preclusive effect than the administrative actions of the EPA.

### 2. Applicability of § 1319(g)(6)(A)(ii)

§ 1319(g)(6)(A)(ii) precludes this citizen suit if the State "has commenced and is diligently prosecuting an action under a State law comparable to this subsection."

The district court concluded that the § 1319(g)(6)(A)(ii) bar .was inapplicable for two reasons. First, the district court concluded that the action at issue was not taken "under a State law comparable to this subsection." Additionally, the district court concluded that "because of the entry of the settlement agreement and the CDO, the Regional Board's enforcement action is no longer still being 'prosecuted' within the meaning of § 1319(g)(6)(A)(ii)."

■ UNOCAL has made no contention in its briefs as to why the district court erred in concluding that the action was no longer being "prosecuted" within the meaning of § 1319(g)(6)(A)(ii).[5] It seems plain that no action *is* being prosecuted at . this ̇ time. Thus, § 1319(g)(6)(A)(ii) . is inapplicable. Furthermore, the Court concludes, for the reasons discussed above with respect to § 1319(g)(6)(A)(ii), that the district court did not err in concluding that the Regional Board's action was not taken "under a State law comparable to this subsection."

### B. Did the Regional Board's Cease and Desist Order Effectively Defer the Compliance Date ·for Selenium Discharges so that UNOCAL is not "in Violation" of an Effluent Standard or Limitation?

UNOCAL asserts that CBE has failed to state a claim because the facts it alleges do not constitute a "violation of an effluent standard or limitation"̇ within the meaning of § 1365(a)(1)(A) because the CDO issued by

---

**4.** As the Supreme Court has stated, "the starting point for interpreting a statute is the language of the statute itself." *Gwaltney,* 484 U.S. at 56, 108 S.Ct. at 381, quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *GTE Sylvania, Inc.,* 447 U.S. at 108, 100 S.Ct. at 2056. "If the intent of Congress is clear, that is the end

of the matter; for the court … must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 ̇S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

**5.** Indeed, the Appellant raised this provision in the district court only in a footnote of its briefs and it was dealt with by the district court in a footnote to its decision.

the Regional Board had the effect of modifying UNOCAL's NPDES permit to extend until 1998 the deadline for complying with the final selenium limit.

33 U.S.C. § 1365 generally authorizes private citizens to sue those violating, among other things, "an effluent standard or limitation" under the Clean Water Act.[6] "Effluent standard or limitation" means "an effluent limitation or other limitation under section 1311" or "a permit or conditions thereof issued under section 1342 [the NPDES provision] of this title." 33 U.S.C. § 1365(f). Thus, violation of the limits specified in an NPDES permit is a violation of "an effluent standard or limitation" within the meaning of § 1365.

The district court concluded that the issuance by the Regional Board of the CDO extending the compliance schedule was akin to an exercise of prosecutorial discretion and did not suspend the limits and deadlines contained in the NPDES permit or shield UNOCAL from this citizen suit. While UNOCAL concedes that the CDO did not purport to modify the NPDES permit and did not constitute a formal amendment or modification of the NPDES permit,[7] it argues that the CDO did have the practical effect of modifying the compliance date contained in the NPDES permit. For the first time on appeal, UNOCAL also argues that the district court was foreclosed, under either the doctrine of exhaustion of remedies or the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), from addressing the argument that the CDO issued by the Regional Board failed to effectively modify the NPDES compliance date because California law provided CBE a right, of which they did not avail themselves, to review of the CDO by appeal to the state water board or by judicial review in state court. California Water Code §§ 13320, 13330.

■■■■ The Court concludes that the federal courts are not precluded from addressing the issue of whether the CDO effectively modified the NPDES compliance date. While it is true that there, were procedures available for CBE to appeal the CDO within the state system, this action does not challenge the validity of the CDO but rather seeks to enforce the requirements of the Clean Water Act. Furthermore, 33 U.S.C. § 1365 makes no mention of exhaustion of state remedies as a prerequisite for bringing a citizen suit. Similarly, *Younger* abstention is not appropriate. There are three requirements for the invocation of *Younger*—ongoing state proceedings, implication of an important state interest in the state proceedings, and an adequate opportunity to raise federal questions in the proceedings. *World Famous Drinking Emporium v. City of Tempe*, 820 F.2d 1079 (9th Cir.1987). While failure to exhaust state appellate remedies may satisfy the requirement that there be ongoing state proceedings, *Id.*, the doctrine is simply not relevant where the federal action is not seeking a ruling on the validity of the state action.

■■■■ The Court further concludes that the CDO at issue did not modify, effectively or otherwise, the terms of UNOCAL's NPDES permit. This conclusion is appropriate for the following reasons.

First, the CDO does not purport to modify the NPDES permit. In the Findings to the CDO, the Regional Board states in paragraph 4 that "[t]he effluent limitations imposed under Order No. 91–026 [amending the NPDES permit to include the final selenium limits] become effective on December 12, 1993. . . . The Regional Board is adopting this Order to enforce the provisions of

---

6. Section 1365 provides, in part, that:

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—

(1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator [of the EPA] or a

State with respect to such a standard or limitation. . . .
33 U.S.C. § 1365.

7. There are specific, mandatory procedure for NPDES permit modification. Cal.Code Regs. Tit. 23, § 2235; 40 C.F.R. § 122.62. *See also Ackels v. U.S.E.P.A.*, 7 F.3d 862, 864, n. 1 (9th Cir.1993). It is undisputed that these procedures were not followed in this case.

Order No. 91–026." Thus, the Regional Board did not intend to modify the Permit but instead worked out a compliance schedule wherein, according to paragraph 7 of the CDO, if "the dischargers have failed to comply with the provisions of this Order [the official may ...] request the Attorney General to take appropriate action against the dischargers, including injunctive and civil remedies, if appropriate, or to issue a Complaint for Board consideration of Administrative Civil Liabilities." Thus, the language of the CDO itself fits with the conclusion that the CDO was an exercise of prosecutorial discretion.

Second, as noted above, federal and state regulations govern the modification of NPDES permits. It is not disputed that these regulations were not followed in this case. These regulations, both procedural and substantive, ensure that the standards embodied in an NPDES permit cannot be evaded with the cooperation of compliant state regulatory authorities. For instance, there are public notice requirements for a permit modification process that are different than those required in an enforcement action. Further, there is a five year duration on the life of an NPDES permit that the "effective modification" asserted here would violate. § 1342(b)(1)(B).

Third, even if the CDO were to be construed as having effectively extended the compliance date in the NPDES permit, such a modification would likely run afoul of the substantive constraint on the ability of regulators to modify permits found in 33 U.S.C. § 1342(o) (the "anti-backsliding" provision). This provision prohibits, with certain narrow exceptions,[8] any modified permit from containing "effluent limitations which are less stringent than the comparable effluent limitations in the previous permit." UNOCAL asserts that the "effective" modification of the permit under consideration would not violate the anti-backsliding provision because the permit contained interim limits which would remain in full effect until the final

limits actually took effect. Essentially, argues UNOCAL, the final limits have never taken effect so they cannot be backslided on. This argument seems to assume that effluent standards are not effectively part of the NPDES permit until they take effect. It appears to the Court, however, that a modified NPDES permit that does not contain a strict effluent limitation that had been about to come into effect is, indeed, "less stringent" than the previous, unmodified NPDES permit—regardless of whether the limitation had yet taken effect.

### III.

For the foregoing reasons, the district court's denial of UNOCAL's motion to dismiss is **AFFIRMED.**

---

**8.** Appellant has asserted that two such exceptions are applicable. Appellant asserts that "new information is available" that "would have justified" a less stringent standard under § 1342(o)(2)(B)(i) and that there is no "reasonably available remedy" under § 1342(o)(2)(C). Because it is not necessary so to do, the Court does not comment on the applicability of these exceptions.