UNITED STATES of America, Plaintiff,

v.

SMITHFIELD FOODS, INC., Smithfield Packing Company, Inc., and Gwaltney of Smithfield, Ltd., Defendants.

Action No. 2:96cv1204.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 30, 1997.

Susan Lynn Watt, Asst. U.S. Atty., Norfolk, VA, Lois J. Schiffer, U.S. Dept. of Justice, Washington, DC, Yvette C. Roundtree, Asst. Regional Counsel, U.S.E.P.A. Office of Regional Counsel, Philadelphia, PA, Nadine Steinberg, U.S.E.P.A., Washington, DC, Sarah D. Himmelhoch, Richard Hong, U.S. Dept. of Justice/Environmental Enforcement Section, Washington, DC, for Plaintiff.

Anthony F. Troy, Mays & Valentine, Richmond, VA, Patrick M. Raher, James T. Banks, John G. Roberts, Jr., Patrick D. Traylor, Hogan & Hartson, L.L.P., Washington, DC, for Defendants.

## *OPINION*

REBECCA BEACH SMITH, District Judge.

This matter is before the court on (1) the Motion to Join the Virginia State Water Control Board and the Virginia Department of Environmental Quality as Parties to this Action filed by Smithfield Foods, Inc., and its subsidiary companies Smithfield Packing Co., Inc., and Gwaltney of Smithfield, Ltd. (hereinafter "defendants" or "Smithfield"), on March 14, 1997, and (2) the Motion for Partial Summary Judgment on Liability and Section 309(g)(6) Issues filed by the United States on March 10, 1997. For the reasons stated from the bench, the court DENIES defendants' Motion to Join the Virginia State Water Control Board and the Virginia Department of Environmental Quality as Parties to this Action. For the reasons stated below, the court GRANTS the United States' Motion for Partial Summary Judgment on Liability and Section 309(g)(6) Issues.

### I. Factual and Procedural History

Smithfield Foods, Inc. is a publicly-held Delaware corporation that owns and operates

two pork processing and packing plants in Smithfield, Virginia, namely Smithfield Packing (a Virginia corporation) and Gwaltney (a Delaware corporation), that discharge wastewater. The wastewater generated by the Smithfield Packing and Gwaltney facilities is treated by two wastewater treatment plants operated by Smithfield Foods, Outfalls 001 and 002. The discharge through Outfall 001 generally originates from the Smithfield Packing plant, while the discharge through Outfall 002 generally originates from the Gwaltney plant. Between at least August, 1991, and the present, defendants discharged treated wastewater from Outfall 001 into the Pagan River, a tributary of the James River. Treated wastewater was also discharged by defendants into the Pagan River through Outfall 002 from at least August, 1991, until June, 1996, when Outfall 002 was connected to the Hampton Roads Sanitation District ("HRSD") system.

### A. The Clean Water Act

The Clean Water Act ("Act") was enacted by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 101, 33 U.S.C. § 1251. In order to achieve these goals, Section 301(a) of the Act prohibits the discharge of pollutants into the waters of the United States by any person except as authorized by specific provisions of the Act. 33 U.S.C. § 1311(a). Section 402, one of the specified sections, establishes the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. Under the NPDES program, the Administrator of the Environmental Protection Agency ("EPA") may issue permits to point sources [1] authorizing the discharge of pollutants in accordance with specified limitations and conditions. Section 402(a), 33 U.S.C. § 1342(a). Section 301(b) of the Act authorizes the EPA to establish nationally applicable effluent limitations for point sources, 33 U.S.C. § 1311(b), which are incorporated into the discharger's permit along with any other requirements established pursuant to the Act. Section 402(a), 33 U.S.C. § 1342(a).

Although the primary responsibility for the administration of the Act lies with the Administrator of the EPA, Section 101(d), 33 U.S.C. § 1251(d), Congress has stated that the participation of the public must be provided for, encouraged, and assisted, see Section 101(e), 33 U.S.C. § 1251(e), and that the "primary responsibilities and rights of States" to control pollution and manage natural resources must be recognized, preserved, and protected. Section 101(b), 33 U.S.C. § 1251(b). Consequently, Section 402(b) of the Act allows a state to become involved in the administration of the NPDES program for discharges within that state's boundaries. 33 U.S.C. § 1342(b). Congress retained in the EPA, however, "close and continuing oversight and supervision of the state program," including the authority to withdraw EPA approval of the state NPDES program in extreme situations. *United States v. Cargill, Inc.*, 508 F.Supp. 734, 740 (D.Del.1981) (citing Section 402(c)(3), 33 U.S.C. § 1342(c)(3)). Accordingly, while the enforcement provision of the Act, Section 309, 33 U.S.C. § 1319, gives "primary responsibility to the state with an approved NPDES system," it also places "significant authority in the EPA to oversee the state's administration and to step in itself in appropriate situations." *Id.*

Once the EPA determines that it should assume enforcement responsibility with regard to a violator, the EPA may issue an order requiring compliance, "commence a civil action for appropriate relief" pursuant to Section 309(b), 33 U.S.C. § 1319(b), or institute administrative proceedings pursuant to Section 309(g), 33 U.S.C. § 1319(g). Not only may the EPA pursue injunctive relief, but the Act also provides for civil penalties not exceeding "$25,000 per day for each violation." Section 309(d), 33 U.S.C. § 1319(d).

### B. The Permits and Special Orders relating to defendants

In March, 1975, the EPA authorized the Commonwealth of Virginia to issue permits governing the discharge of pollutants into navigable waters within the Commonwealth.

---

1. A "point source" is defined as "any discernable, confined and discrete conveyance, ... from which pollutants are or may be discharged." Section 502(14), 33 U.S.C. § 1362(14).

Pursuant to this authorization, the Virginia State Water Control Board ("Board") issued Permit No. VA0059005 ("Permit") to Smithfield on May 13, 1986. The Permit placed various restrictions on the operation of Smithfield's wastewater treatment plants, including limitations on the amount and concentration of certain pollutants in the wastewater. In addition, the Permit required Smithfield to monitor the wastewater discharged from the outfalls, submit Discharge Monitoring Reports ("DMRs") reporting the results of wastewater sampling and analysis, submit the results of annual toxicity testing, and retain all sampling and analysis data for three years. The 1986 Permit imposed stricter total Kjeldahl nitrogen ("TKN") limits on Smithfield than prior permits governing Outfalls 001 and 002.[2]

Pursuant to its authority to promulgate state environmental standards more stringent than those required by federal law, the Commonwealth promulgated its "Policy for Nutrient Enriched Waters" ("Policy"), effective May 25, 1988, which provided for the control of discharges of nutrients from point sources affecting state waters designated "nutrient enriched waters." Va. Admin. Code tit. 9, § 25–40–10 *et seq.* The Policy required the Board to reopen and modify the permits of point sources discharging into nutrient enriched waters to include a monthly average phosphorus effluent limitation of 2.0 mg/l. The Pagan River is designated a "nutrient enriched water." Va. Admin. Code tit. 9, § 25–260–350(17). Because the Policy applied to defendants' facilities, on June 3, 1988, Smithfield filed a petition of appeal in Isle of Wight Circuit Court challenging the 2.0 mg/l standard as not reasonable and practical of attainment.

Notwithstanding Smithfield's appeal, the Board reopened and modified Smithfield's Permit to include the 2.0 mg/l phosphorus limitation on January 4, 1990. The modified January 4, 1990 Permit, which was approved by the EPA, retained the requirements of the 1986 Permit, but added the phosphorus limitation of 2.0 mg/l and required monitoring for total nitrogen. Part I.C. of the Permit included the following "Schedule of Compliance" for the total phosphorus limitations: (1) initiate design of facilities within 30 days after the modification date of the permit; (2) submit plans to the Board within 90 days from # 1; (3) commence construction within 30 days of the Board's approval of the plans; (4) complete construction within 29 months of # 3; and (5) achieve compliance with final effluent limitations 30 days after completion of construction. Jan. 4, 1990 Permit, Part I.C., at 3. Smithfield appealed the modified 1990 Permit. Since the new phosphorous limitations were not required in other states, the company considered moving its operations outside of Virginia if forced to comply.

After conducting negotiations with Smithfield, the Board elected to settle the dispute concerning the phosphorus limitations by issuing a Special Order on March 21, 1990. In the March, 1990 Special Order, the Board first explained the deadlines imposed by the modified 1990 Permit: Smithfield was "required to commence design of treatment works to achieve compliance with th[e] phosphorus limitation on February 4, 1990, and complete design within 90 days thereafter. Smithfield is further required to attain full compliance with the phosphorus limitation by January 4, 1993." March 21, 1990 Special Order at 1.[3] Because Smithfield challenged the schedule of compliance for the phosphorus limitations in Part I.C. as unreasonable and not practicable of attainment, the Board agreed "to defer commencement of the schedule in Part I.C. of the 1990 Permit until

---

**2.** The Board imposed "interim limits" for TKN in a Special Order dated May 13, 1986, that were less strict than the limits set forth in the 1986 Permit because "the Board and Smithfield recognize[d] that additional water quality data on the Pagan River would be of benefit in confirming the model prediction" used to set the stricter TKN limits in the 1986 Permit. In return, Smithfield was required to submit water quality data and modeling information to the Board by March 31, 1987. *See* May 13, 1986 Special Or-

der. In an amendment to the May, 1986 Special Order, dated January 25, 1988, the Board extended the deadline for Smithfield's submission of data to October 1, 1988, and set forth a schedule of compliance for the TKN standards.

**3.** In the record, this is the first time "January 4, 1993," is mentioned as the date that Smithfield must attain full compliance with the phosphorus limitation. March 21, 1990 Special Order at 1.

December 1, 1990." *Id.* at 2.[4] The Special Order also continued the interim effluent limits for TKN. *Id.* The Board noted that "[t]he remainder of the Permit shall remain in effect pending further action by the Board." *Id.* In return, Smithfield agreed, *inter alia,* to (1) study the available costs and technologies involved in achieving compliance with the phosphorus limitations, (2) study the feasibility of connecting its wastewater system to the HRSD system, and (3) notify the Board by November 13, 1990, whether it intended to connect to the HRSD system. *Id.* at 1–2.

The Board issued an amendment to the March, 1990 Special Order on November 6, 1990. In the November, 1990 Special Order, the Board gave Smithfield until February 15, 1991, a three-month extension, to advise the Board whether it intended to connect to the HRSD system. The Board also agreed "to defer commencement of the schedule" of compliance for phosphorous limitations set forth in Part I.C. of the Permit until March 1, 1991.[5]

On May 9, 1991, the Board issued another Special Order granting an extension to Smithfield. In the May, 1991 Special Order, the Board required Smithfield to notify the Board no later than June 15, 1991, of defendants' commitment "to connect to the HRSD line or to upgrade their facilities to comply with the 2 milligram per liter phosphorus standard." May 9, 1991 Special Order at 2.

If Smithfield agreed to connect to the HRSD system, it was required to do so within three months after notification by HRSD that a sewer line was available for the collection of defendants' wastewater. If Smithfield decided not to connect to the HRSD system, it was required to "submit by August 15, 1991, an approvable schedule for upgrading its treatment facilities to comply with all Permit effluent limitations." *Id.*

The May, 1991 Special Order also indicated that Smithfield was required to comply with the interim effluent limitations in Appendix A of the Special Order, until it connected to the HRSD system or completed the approved upgrade of its treatment facilities. *Id.* The first part of Appendix A set forth discharge limitations and monitoring requirements for TKN, and the second part stated that "[e]ffluent limitations and monitoring requirements for all other parameters and characteristics shall be those set out in the Permit." *Id.* at App. A. The May, 1991 Special Order also provided that Smithfield must dismiss its challenge to the phosphorus standard in Isle of Wight Circuit Court.[6] At the end of the May, 1991 Special Order, the Board stated that "[n]othing herein shall be construed as altering, modifying, or amending any term or condition contained in VPDES Permit No. VA0059005." *Id.* at 2.

On June 7, 1991, Smithfield notified the Board of its decision to connect its wastewater treatment facility to the HRSD system.

---

**4.** Initially, it was not clear from the March 21, 1990 Special Order whether the Board intended to defer just the *commencement* of the schedule of compliance from February 4, 1990 to December 1, 1990, or if the Board intended to defer the *entire schedule* of compliance, so that full compliance with the phosphorus limitation was not required until several months after January 4, 1993. The court concludes that the Board only deferred the commencement of the schedule, and not the entire schedule of compliance, for several reasons. First, the Special Order clearly states that "[t]he Board agrees to defer *commencement* of the schedule...." March 21, 1990 Special Order at 1 (emphasis added). Second, in the record, this March 21, 1990 Special Order is the first time the date January 4, 1993, is cited as the date of full compliance required by the modified 1990 Permit. *See supra* note 3. While the Board deferred commencement of the schedule from February 4, 1990 to December 1, 1990, it did not similarly defer the date of full compliance, January 4, 1993, to a later date. Third, in the subse-

quent 1992 Permit, the Board included the January 4, 1993 date, and not a later date, for full compliance with the phosphorus limitation. This issue of whether the Board's March, 1990 Special Order deferred the commencement of the schedule, or the entire schedule of compliance, is not in any way dispositive, however, as the court has found that the EPA was not bound by the Board's Special Orders. *See infra* Part II.B.2.

**5.** Again, while initially it was not clear if the Board agreed to defer the commencement of the schedule, or the entire schedule of compliance, the court concludes that it intended the former here. *See supra* note 4.

**6.** The Isle of Wight Circuit Court dismissed Smithfield's action on April 1, 1991, actually predating the May, 1991 Special Order. Defs.' Br. at ix, ¶ 9bb.

Consequently, Smithfield "ceased all attempts to comply with the phosphorus limits by upgrading its treatment facilities" and "instead conduct[ed] studies and cooperat[ed] with HRSD to ensure compatibility of Smithfield's effluent with HRSD's system." Defs.' Br. at x, ¶ 9jj.

In 1991, the Board issued a draft of a new Permit for Smithfield. Part I.B. of the draft Permit retained the schedule of compliance for the phosphorus limitation first included in the modified 1990 Permit; Smithfield was required to achieve compliance with the phosphorus limitation by January 4, 1993. Part I.C. stated that the phosphorus limitation in effect after that date was a monthly average of 21 lbs/day and 2 mg/l. After reviewing the draft Permit, the EPA advised the Board that it had no objection to the issuance of the revised draft Permit. July 25, 1991 Letter from EPA to Board (Defs.' Ex. 27). The EPA reminded the Board that "[a]ny additional changes to the draft permit will require EPA review prior to issuance." *Id.*

On October 1, 1991, Smithfield submitted the following comments to the Board regarding Part I, Sections B and C, of the draft Permit:

Compliance dates of the effluent characteristics and engineering milestones listed in the Part I, Section C tables (pages 6 and 7) cannot be met by Smithfield Foods, Inc. now that we have agreed to abandon the plans to upgrade our existing facilities and[7] tap onto HRSD when it becomes available. Relief from such compliance is not specifically present or is not apparent in the [1991] Consent Order. In view of these factors, Smithfield Foods, Inc. requests that if these compliance dates and milestones are required in the proposed permit, some documentation or letter be provided by the State Water Control Board stating that alternate compliance will be maintained with Smithfield's agreement to connect to HRSD as soon as it becomes available regardless of the time frame in which this occurs.

Oct. 1, 1991 Letter from Smithfield to Board at 3 (Defs.' Ex. 25). The Board responded as follows in a letter dated October 10, 1991:

The draft permit is a separate document from the current Consent Special Order issued to Smithfield Foods in May 1991. The effluent limitations imposed on two point source discharges from the facility are based on State Water Quality Standards, the Permit Regulation and the revised Pagan River Model presented to the Board. The compliance schedules and related goal dates contained in the permit are there to afford the permittee necessary time to comply with the established effluent limitations. Any special order agreements relative to compliance with water quality standards, the Permit regulation and associated studies that have been approved by the Board take precedence over the VPDES Permit.

Oct. 10, 1991 Letter from Board to Smithfield at 2, ¶ 3 (Defs.' Ex. 26). The EPA was provided a copy of the Board's letter. *See id.*

On December 23, 1991, the Board staff sent a memorandum to the Executive Director of the Board recommending approval of the proposed 1992 Permit. Dec. 23, 1991 Memorandum Accompanying 1992 Permit (Defs.' Ex. 23). The Board staff indicated that Smithfield "notified the Board that it will eliminate its wastewater discharges to the Pagan River and connect its facilities to the HRSD system when the sewer has been extended to their plant." *Id.* at 2. The staff noted that Smithfield's "discharge is not controversial and is expected to meet the required final effluent limitations" and that it believed "that the future effluent limitations will maintain the Water Quality Standards adopted by the Board." *Id.* at 4.

On January 3, 1992, the Board issued Smithfield's 1992 Permit. Despite Smithfield's October 1, 1991 letter to the Board stating that it could not meet the compliance dates listed in Part I.C. of the draft 1992 Permit now that it had agreed to connect to the HRSD, the Board did not change the

---

**7.** In their brief, defendants insert the word "[instead]" between "and" and "tap" when quoting this portion of Smithfield's letter. Defs.' Br. at xi, ¶ 9kk. The word "instead," or a similar word, is not included in the original text of Smithfield's letter.

terms of the 1992 Permit. Part I.C. of the 1992 Permit retained the monthly average phosphorus limitation of 21 lbs/day and 2 mg/l, which was required after "completion of the schedule of compliance contained in Part I.B. (Total Phosphorus)." January 3, 1992 Permit, Part I.C., at 7. Part I.B. of the 1992 Permit required Smithfield to: (1) "[s]ubmit quarterly progress reports for achievement of final effluent limitations" for phosphorus "[w]ithin 30 days of the effective date of the permit and each calendar quarter thereafter until completion of item # 2 below" and (2) "[a]chieve compliance with final effluent limitations" for phosphorous "[b]y January 4, 1993." Id. Part I.B., at 5.[8] A three-year schedule of compliance was also included for carbonaceous biological oxygen demand ("CBOD"), total cyanide, and ammonia-nitrogen,[9] which required Smithfield to "[a]chieve compliance with the final effluent limitations" for those effluents no later than May 13, 1994. Id. Part I.D., at 8.

In response to a February 12, 1992 letter from Smithfield to the Board, which indicated that Smithfield intended to achieve compliance with the final effluent limitations for CBOD, total cyanide, and ammonia-nitrogen by connecting to the HRSD system, the Board responded as follows:

> These "plans" are acceptable as submitted. The remainder of the schedule requires submittal of quarterly progress reports. These reports should indicate construction progress and other issues which may affect completion of the project. Also note that the deadline for achieving final effluent

limitations is May 13, 1994. Should construction be delayed such that this deadline may be missed, a modification to the existing Consent Order should be requested.

May 15, 1992 Letter from Board to Smithfield (Defs.' Ex. 30).[10]

Defendants failed to meet either the January 4, 1993 deadline in the 1992 Permit for phosphorus compliance, or the May 13, 1994 deadline in the 1992 Permit for CBOD, total cyanide, and ammonia-nitrogen compliance. There is no evidence in the record that Smithfield sought or procured a permit modification with regard to these deadlines.

On November 8, 1994, the Board issued an amendment to the May, 1991 Special Order. In the November, 1994 Special Order, the Board agreed that Smithfield "may achieve compliance with the [final effluent limitations for CBOD, total cyanide, and ammonia-nitrogen] by connecting to the HRSD system" and agreed "to hold in abeyance the requirement in Part I.D.6. of the Permit for Smithfield to comply with these effluent limitations by May 13, 1994." November 8, 1994 Special Order at 1. In addition, the Board and Smithfield agreed "that an appropriate toxicity reduction evaluation plan, as required by Part I.F.4.c. of the Permit, is connection to the HRSD system in accordance with this Order. No additional toxicity testing is required." Id. at 1–2. At the end of the Special Order, the Board and Smithfield agreed that they both "understand and agree that this amendment does not alter, modify, or amend any other term or condition of the Order or of

---

8. Because Smithfield agreed to connect to the HRSD system, defendants contend that this schedule of compliance for the phosphorus limitations "merely provided the official point of reference that would be needed in case Smithfield reneged on its commitment to make the HRSD connection." Defs.' Br. at xii, ¶ 9nn. There is nothing in the record to support this conclusion.

9. The terms "ammonia" and "ammonia-nitrogen" have both been used in the parties' briefs, filings, and exhibits, often interchangeably. Thus, it is unclear to the court whether the United States is alleging violations of the same or different effluent limitations when it alleges a violation of "ammonia-nitrogen" in Counts I and II, and a violation of "ammonia" in Counts III

and IV. The Summary of Violations attached to Nash's Declaration, and the United States' brief in support of their motion for summary judgment only mention violations of "ammonia-nitrogen." Pl.'s Br. at iii, ¶ 9. Accordingly, the court will assume that "ammonia" and "ammonia-nitrogen" are the same effluent when quoting the record, and the court will refer to the effluent at issue as "ammonia-nitrogen."

10. In their brief, defendants state that "Smithfield was specifically exempted from the May 13, 1994 deadline for ammonia and cyanide in the letter from the Board dated May 15, 1992. (Exh. 30 at 1)." Defs.' Br. at xvi, ¶ 23. Clearly, the text of this letter from the Board shows that Smithfield was reminded of the deadline rather than "specifically exempted" from it.

the Permit except as specified above." *Id.* at 2.

No other Special Orders are relevant to the issues before this court at this time.

## C. *The HRSD system connection*

Before defendants could connect to the HRSD system, Smithfield explains that three tasks had to be completed: (1) an upgrade of Smithfield's wastewater treatment system to pretreat properly the effluent before discharging it into the HRSD system; (2) construction of a seventeen-mile interceptor force main pipeline extending from the HRSD treatment facility to Smithfield, Virginia; and (3) an upgrade of HRSD's Nansemond treatment facility so that it could properly treat the additional effluent from defendants. Defs.' Br. at ix, ¶ 9dd.

Smithfield hired Wells Engineering to design and construct onsite wastewater treatment works sufficient to pretreat adequately its process effluent. *Id.* at ix, ¶ 9ee.[11] On August 23, 1991, HRSD submitted a Virginia Revolving Loan Fund Construction Assistance Program ("CAP")[12] application to the Board requesting funding of approximately $14.6 million for the construction of the seventeen-mile interceptor force main pipeline. The initial completion date for the pipeline was February, 1995. *Id.* at xii, ¶ 9pp. On July 29, 1992, HRSD submitted another CAP application to the Board requesting funding of approximately $54.4 million for upgrading the HRSD Nansemond facility to a treatment capacity of twenty-million-gallons per day. Although the original completion deadline for the Nansemond facility upgrade was December, 1996, *id.* at x, ¶ 9hh, this completion deadline was extended several times by the HRSD, to March 25, 1997. *Id.* at x, ¶ 9ii.[13]

The interceptor force main pipeline was completed on March 22, 1996, thirteen months after the original deadline for completion. *Id.* at xiii, ¶ 9qq. Outfall 002 at the Gwaltney plant was connected to the HRSD system on June 24, 1996, and there is currently zero discharge from this facility into the Pagan River. *Id.* at x, ¶ 9gg. Defendants expect to connect Outfall 001 at the Smithfield Packing plant to the HRSD system in May, 1997, as soon as the Nansemond facility is available, and completely cease their discharge from Outfall 001. *Id.* at x, ¶ 9ii.

## D. *Enforcement by the EPA*

Under the NPDES enforcement program administered by the EPA, point source facilities that are not complying with their NPDES permit are listed in the EPA's Quarterly Noncompliance Report ("QNCR"). Decl. of Lorraine H. Reynolds ¶ 8. According to Ms. Reynolds, an Environmental Scientist with the EPA, defendants' violations of Permit No. VA0059005 did not appear on the QNCR until the third quarter of the 1994 fiscal year, because Smithfield falsely and inaccurately reported its discharges, and because the Commonwealth of Virginia issued consent orders allowing defendants to exceed the limits established in the Permit. *Id.* ¶ 12. Ms. Reynolds notes that the "EPA was not a participant nor a signatory to the Commonwealth issued consent orders and therefore, EPA never agreed nor intended to be bound by the consent orders." *Id.* ¶ 13.

Once a company appears on the QNCR, the EPA begins to track the state's actions in getting the company into compliance. If the state does not achieve compliance, the EPA steps in and initiates its own enforcement

---

**11.** It is unclear when Wells Engineering completed this construction, but it appears it may have been completed in 1996, as defendants state that "Wells Engineering designed and constructed these required facilities at a capital cost of approximately $3 million in 1995 and 1996." Defs.' Br. at ix, ¶ 9ee.

**12.** In the Clean Water Act, Congress directed the EPA to establish capitalization grants, known as "state revolving funds," to each state to assist in the construction of publicly-owned treatment works. Section 601, 33 U.S.C. § 1381. Before

funds will be given to a state, the EPA must enter into an agreement with that state establishing a procedure for the distribution of funds. Section 602, 33 U.S.C. § 1382. Once that agreement has been established, as it has in Virginia, the state oversees the individual projects. Section 603, 33 U.S.C. § 1383.

**13.** It is not clear from the record whether this project completion date for the Nansemond upgrade was met.

action to ensure compliance. *Id.* ¶ 9. Once defendants' violations of Permit No. VA0059005 appeared on the QNCR in 1994, the EPA tracked the Commonwealth's attempts to get Smithfield into compliance. *Id.* ¶ 14.

On April 8, 1996, the Commonwealth's Department of Environmental Quality ("DEQ") notified Smithfield that it had evidence of numerous violations of the Permit and Special Orders, including violations of effluent limits, sampling and analysis methods, recording of results, records retention, reporting requirements, operator requirements, treatment works operation, quality control requirements, and unauthorized discharge of pollutants. April 8, 1996 Letter from DEQ to Smithfield at 1 (Pl.'s Ex. 18). Due to these violations, the DEQ stated it would recommend to the Board that it consider asking the Attorney General of Virginia to seek injunctive relief and civil penalties against Smithfield. *Id.* at 2. At their May 22, 1996 meeting, however, the Board instead voted to "reaffirm their March 21, 1996, approval of the Consent Special Order for the HRSD Nansemond Treatment Plant" and "direct [its] staff not to take enforcement action against Smithfield, Inc. for violations of their 1991 Consent Special Order until such time as staff has met with the company and brought the matter back to the Board at their next meeting." Excerpt of Minute No. 28 from the Board Meeting on May 22, 1996 (Pl.'s Ex. 19).

"When it became apparent that the Commonwealth's actions were not resulting in compliance, and the Commonwealth did not intend to seek a civil penalty for the violations, the EPA initiated its own enforcement action." Decl. of Reynolds ¶ 14. On August 27, 1996, the EPA informed the Commonwealth that it had referred a case against defendants to the United States Department of Justice for an enforcement action, and invited the Commonwealth to join the federal action. The EPA provided the Commonwealth with a copy of the table of defendants' violations. *Id.* ¶ 15.

The Commonwealth declined the EPA's invitation to join the federal action. Although the Commonwealth never mentioned its plan to file its own enforcement action to the EPA, *id.*, on August 30, 1996, the Commonwealth filed an action against Smithfield in the Circuit Court of the County of Isle of Wight. The Commonwealth sought injunctive relief and civil penalties for Smithfield's violations of the Permit and Special Orders, and alleged violations of "the Permit limitations for fecal coliform, pH, total suspended solids, biochemical oxygen demand, and oil and grease" dating back to 1994. Commonwealth's Complaint at 3 (filed Aug. 30, 1996) (Pl.'s Ex. 23). The Commonwealth did not seek penalties for phosphorus violations, inaccurate reporting, or late reporting. *See id.* at 1–4. The Commonwealth amended its complaint on September 20, 1996, to correct certain factual allegations and to add an allegation that Smithfield violated "other permit terms and conditions" of Permit No. VA0059005. Commonwealth's Amended Complaint at 3 (filed Sept. 20, 1996) (Pl.'s Ex. 24).

The United States filed this action on December 16, 1996, seeking permanent injunctive relief and civil penalties from all three defendants for violations of Clean Water Act § 309(b) and (d), 33 U.S.C. § 1319(b) and (d). Count I alleges that since October, 1991, defendant Smithfield discharged pollutants from Outfall 001 into the Pagan River in violation of the effluent limits in the Permit for phosphorus, ammonia-nitrogen, TKN, fecal coliform, pH, cyanide, and oil and grease. Count II alleges that from October, 1991, until June, 1996, defendant Smithfield discharged pollutants from Outfall 002 into the Pagan River in violation of the effluent limits in the Permit for phosphorus, ammonia-nitrogen, TKN, fecal coliform, and oil and grease. In Counts III and IV, plaintiff alleges that since October, 1991 for Count III, and between October, 1991 and June, 1996 for Count IV, defendants Smithfield Packing and Gwaltney discharged pollutants from Outfalls 001 and 002 into the Pagan River in violation of the effluent limits in the Permit for phosphorus, ammonia, TKN, fecal coliform, pH, cyanide, oil and grease, CBOD, and biological oxygen demand ("BOD"). In the alternative, Counts III and IV allege that on numerous occasions during these time periods, Smith-

field Packing and Gwaltney discharged pollutants from Outfalls 001 and 002 into the Pagan River without a permit. Count V alleges failure of all defendants to comply in a timely manner with the Permit's reporting requirements since October, 1991. Count VI alleges that all defendants submitted DMRs containing inaccurate information. Count VII alleges failure of defendants to maintain records, or destruction of records required to be maintained by the Permit.

Defendants' Answer, filed January 9, 1997, put forth several affirmative defenses. Defendants maintain Permit No. VA0059005 was

> actually or constructively conditioned or amended, or an actual or constructive variance granted, or the underlying standards were revised by the issuance of several Special Orders and amendments thereto by the Virginia State Water Control Board. None of the Defendants violated the permit as revised with respect to the following pollution parameters: phosphorus, nitrogen, CBOD, cyanide and ammonia.

Answer at 13. Defendants also argue that they agreed to connect to the HRSD system to achieve compliance with the Permit, but were unable to connect earlier due to circumstances and delays beyond their control. Therefore, even if they did fail to meet the terms of the Permit, defendants claim they "cannot be held liable therefor when it was impossible to meet the terms of the permit until the [HRSD] sewer line had been completed." *Id.* at 14–15.[14] In addition, defen-

dants assert that plaintiff's claim for civil penalties is barred by the doctrines of estoppel, waiver, and/or laches, and by Section 309(g)(6)(A) of the Clean Water Act. *Id.* at 12–13.[15]

In the United States' Motion for Partial Summary Judgment on Liability and Section 309(g)(6) Issues, filed March 10, 1997, the United States argues that there is no genuine issue of material fact that defendants committed thousands of days of violations of the Clean Water Act by discharging pollutants into the Pagan River at levels above the limits contained in the Permit[16] and that Smithfield committed over one hundred days of violations by submitting required reports late. In addition, the United States contends it is entitled to summary judgment because the Permit did not incorporate the Special Orders issued by the Commonwealth, the United States is not estopped from enforcing the Permit, and the United States' claims are not barred by Clean Water Act § 309(g)(6)(A), 33 U.S.C. § 1319(g)(6)(A).

In defendants' response, filed March 26, 1997, they address the issues in the United States' Motion, and also argue that the United States is not entitled to summary judgment with regard to the phosphorus claims because Section 510 of the Act, 33 U.S.C. § 1370, bars federal enforcement of limitations that are set by the state and that are more stringent than federal limits. The United States filed a rebuttal on April 1, 1997. The court heard argument from the

---

**14.** Although defendants maintain that it is not their fault that the HRSD connection was delayed, fault is not the focus of this inquiry, as the Clean Water Act is a strict liability statute, intended to protect the public from environmental damage. *Stoddard v. Western Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir.1986). It is the defendants, and not the public, who are discharging wastewater into the Pagan River, who waited until June 7, 1991, to commit to connect to the HRSD system, and who have still not fully connected to the HRSD system. Accordingly, it is defendants, and not the public, who should pay the price for the damage to the environment caused by their Permit violations and the delay in the HRSD connection. *See also infra* note 19.

**15.** In their response, defendants indicate that they believe that plaintiff's claim for injunctive relief is also barred by Section 309(g).

**16.** The United States alleges violations of phosphorus, ammonia-nitrogen (or ammonia), TKN, fecal coliform, pH, cyanide, oil and grease, CBOD, and BOD in the Complaint. In their brief and the Summary of Violations, however, the United States alleges violations of phosphorus, ammonia-nitrogen, TKN, fecal coliform, pH, cyanide, oil and grease, and *total suspended solids—* not CBOD and BOD. *See* Pl.'s Br. at iii, ¶ 9; Decl. of Nash at App. C. Because the limits for CBOD and BOD are listed separately from the limits for total suspended solids in the Permit, the court will address separately the violations of the effluent limitations for CBOD, BOD, and total suspended solids.

parties on April 14, 1997, and the matter is ripe for decision.

## II. Analysis

Summary judgment is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Such facts must be presented in the form of exhibits and sworn affidavits. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The court concludes that the United States is entitled to partial summary judgment as a matter of law for several reasons. First, there is no genuine issue of material fact that defendants are liable for violations of Clean Water Act § 309(b) and (d), 33 U.S.C. § 1319(b) and (d). Specifically, Smithfield Foods is liable for at least 164 days of violations of the reporting requirements of Permit No. VA0059005 (Count V); and defendants Smithfield Foods, Smithfield Packing, and Gwaltney are liable for any violations of the effluent limitations contained in Permit No. VA0059005 for: phosphorus, ammonia-nitrogen, TKN, fecal coliform, minimum pH, cyanide, oil and grease, CBOD, BOD, and total suspended solids (Counts I–IV). Second, Permit No. VA0059005 did not incorporate, nor was it conditioned, revised, or superseded by, the Board's Special Orders issued

prior to the filing of this action. Third, the United States' claims are not barred by estoppel. Fourth, the United States' claims are not barred by Clean Water Act § 309(g)(6)(A), 33 U.S.C. § 1319(g)(6)(A). Fifth, the United States' phosphorus claims are not precluded by Clean Water Act § 510, 33 U.S.C. § 1370. Each of these conclusions is addressed in turn below.

### A. Clean Water Act violations

The United States alleges that defendants violated Permit No. VA0059005 when Smithfield Foods submitted late reports, and when all the defendants discharged wastewater into the Pagan River that violated the effluent limitations contained in the Permit. Section 309(a)(3) of the Act provides that the EPA can bring a civil action in accordance with Section 309(b), 33 U.S.C. § 1319(b), for appropriate relief against "any person ... in violation of any permit condition or limitation ... in a permit" issued pursuant to the Clean Water Act. 33 U.S.C. § 1319(a)(3).

Under Section 502(5), 33 U.S.C. § 1362(5), a corporation is considered a "person" within the meaning of the Act. It is undisputed that Smithfield Foods and Gwaltney are Delaware corporations, and Smithfield Packing is a Virginia corporation, thereby constituting "persons" under the Act. In their Answer, however, defendants contend that Smithfield Packing and Gwaltney did not have any obligations or duties under Smithfield Foods' Permit, and thus cannot be held liable for violations of the Permit, because they are not named in the Permit. The court disagrees. First, Section 309(a)(3), 33 U.S.C. § 1319(a)(3), clearly states that "persons"—not permit holders—are liable for permit violations. Second, defendants admit that "Smithfield Foods operates two wastewater treatment plants which accept and treat the wastewaters generated by the Smithfield Packing and Gwaltney facilities." Answer ¶ 18. By generating wastewater discharged into Smithfield Foods' wastewater treatment plants, which was then discharged into the Pagan River, Smithfield Packing and Gwaltney actively caused violations of Smithfield Foods' Permit and are, therefore, considered "persons" who may be

held liable for violations of the Act.[17] *Cf. United States v. Avatar Holdings, Inc,* No. 93–281–CIV–FTM–21, 1995 WL 871260, at \*14 (M.D.Fla. Nov. 22, 1995) (unpublished) (parent liable for subsidiaries' violations if parent "acted in such a way that it may be considered a 'person who violates' under § 309(d) of the Clean Water Act, through such actions as directing or causing the violations").

### 1. *Smithfield Foods' late submittal of reports*

The United States claims that Smithfield Foods did not timely submit the Discharge Monitoring Reports detailing the results of sampling and analysis of the wastewater discharged from Outfalls 001 and 002. Smithfield Foods' Permit No. VA0059005 requires submission of DMRs reporting the results of sampling on individual parameters within ten days of the end of each month. According to Leonard Nash, an Environmental Protection Engineer with the EPA, Smithfield Foods submitted the September, 1994 DMR, which was due on October 10, 1994, without reporting a value for average loading of TKN. The Notice of Violation issued by the Commonwealth of Virginia indicates that this missing information was not submitted until 58 days after it was due, on December 9, 1994. Decl. of Nash ¶ 17–18.

 Smithfield Foods does not contest that the DMR did not contain the value for the average loading of TKN. Instead, it contends that the EPA could have easily calculated this value using information in the DMR on both flows and concentrations. The court agrees with the United States that the Clean Water Act requires the permittee to submit the values in the DMR, not just the raw data, because "[i]f Smithfield Foods' argument prevailed, every person required to submit discharge monitoring reports could simply provide EPA with copies of their data and demand that the regulators determine the values." Pl.'s Rebuttal at 3. In addition, Smithfield Foods explains that the employee responsible for submitting the DMRs was on sick leave from late August, 1994, until October, 1994, and that the data was submitted

within a reasonable time after the error was discovered. Defs.' Br. at xiii, ¶ 12. These excuses, however, are irrelevant with regard to Smithfield Foods' liability for violations of the Permit, because the Clean Water Act is a strict liability statute. *Stoddard v. Western Carolina Regional Sewer Auth.,* 784 F.2d 1200, 1208 (4th Cir.1986).

The Permit also required the submission of annual reports regarding Smithfield Foods' toxics management plan by May 10, 1993. Decl. of Nash ¶ 19. According to the Notices of Violation, Smithfield Foods' annual toxics management plan was not received until August 26, 1993, which was 106 days late. Smithfield Foods does not contest this fact. Defs.' Br. at xiii, ¶ 12.

Because these two incidents of late reporting by Smithfield Foods are uncontested violations of Permit No. VA0059005, the court GRANTS summary judgment against Smithfield Foods on the issue of liability for at least 164 days of violations of the reporting requirements of the Permit. If the United States uncovers additional instances of late reporting during discovery, or any other violations of the Permit, the court will allow it to prove these additional violations by defendants.

### 2. *Defendants' violations of effluent limits*

 Permit No. VA0059005 requires the submission of monthly reports detailing the results of sampling conducted on wastewater discharged from defendants' plants. Decl. of Nash ¶ 12. A copy of the DMRs submitted by defendants is attached as Appendix B to Mr. Nash's Declaration. *Id.* at App. B. "Required reports such as DMRs may be used as admissions in court to establish a defendant's liability." *Sierra Club v. Simkins Indus., Inc.,* 847 F.2d 1109, 1115 n. 8 (4th Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). Consequently, several courts have accepted the data reported by a defendant in its DMRs as true, and entered summary judgment on the issue of liability based on the DMRs completed by that defendant. *See, e.g., Connecticut Fund for the*

---

**17.** Defendants did not dispute this argument in their response to the United States' Motion.

*Environment v. Job Plating Co., Inc.*, 623 F.Supp. 207, 218 (D.Conn.1985) (granting summary judgment based on DMRs, and noting that several courts who granted summary judgment in citizen suits brought under 33 U.S.C. § 1365 based their decision "on findings of strict liability derived from discharge data reported in defendants' DMRs that exceeded levels allowed by NPDES permits"); *Student Public Interest Research Group of New Jersey v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1429–33 (D.N.J. 1985) (accepting as true the data reported in a defendant's DMR, and rejecting defendant's argument that when it exceeded its permit, this was not a violation of the Act). Since the Act's approach of regulating effluent levels "was intended to achieve 'swift and direct' enforcement based on 'simple numerical standards,'" *Georgia–Pacific*, 615 F.Supp. at 1430 (citing *Corn Refiners Ass'n, Inc. v. Costle*, 594 F.2d 1223, 1226 (8th Cir. 1979)), this court is reluctant to limit the legal effect of any permit violations revealed in the DMRs completed by defendants.

■ Defendants' DMRs have been reviewed by Mr. Nash in accordance with his position at the EPA. Based on the DMRs, Mr. Nash has determined that defendants have committed numerous violations of the Permit, which are summarized in Appendix C

to Mr. Nash's Declaration. Decl. of Nash ¶ 14 & App. C.[18] Although defendants contend that they did not violate "the permit as revised with respect to the following pollution parameters: phosphorus, nitrogen, CBOD, cyanide, and ammonia," Answer at 13, defendants submitted DMRs which indicate that they did violate the effluent limitations contained in the Permit, and they admit that "Smithfield Foods has on occasion discharged effluent from Outfalls 001 and 002 in excess of the limits in VPDES Permit No. VA0059005, as issued, amended, revised and reissued from time to time, which permit speaks for itself." *Id.* at 5, ¶ 25. Because defendants grudgingly admit that they violated the terms of the Permit, if the Permit is considered in isolation from the Board's Special Orders and letters, and because defendants' DMRs are admissions for the purpose of establishing liability and they indicate that defendants have repeatedly violated the effluent limits contained in the Permit, the court GRANTS the United States summary judgment on the issue of liability for defendants' violations of the effluent limitations contained in Permit No. VA0059005 for: phosphorus, ammonia-nitrogen, TKN, fecal coliform, minimum pH, cyanide, oil and grease, CBOD, BOD, and total suspended solids.[19] The amount of the days of violation

18. In determining the number of days of violations, Mr. Nash counted each daily maximum violation as a separate violation. For each monthly average violation, Mr. Nash calculated the number of violations by using the number of days in that month. Decl. of Nash ¶ 16 & App. B. According to these calculations, defendants committed 5,330 total days of violations of the effluent limits contained in Permit No. VA0059005: 4,501 for phosphorous, 458 for ammonia-nitrogen, 199 for TKN, 70 for fecal coliform, 4 for minimum pH standard, 4 for cyanide, 1 for oil and grease, and 93 for total suspended solids. Pl.'s Br. at iii, ¶ 9. Although offering no concrete evidence to the contrary, defendants disagreed with the United States' determination of the number of days of violations, and reserved the right to address this issue at a later time. Defs.' Br. at 10 n. 3.

19. In their brief and at the April 14, 1997 hearing, defendants argued that they should not have to pay penalties to the federal government for alleged violations of the 1992 Permit because they have paid, and continue to pay, a substantial amount of money for the HRSD connection, and

because there will be zero discharge by defendants into the Pagan River once they connect Outfall 001 to the HRSD system, as Outfall 002 has already been connected. While defendants' efforts to eliminate their discharge into the Pagan River are certainly laudable, they are still required to meet their obligations under the Permit. This is true even if the court believes that defendants did not cause the delay in finishing the HRSD–Smithfield connection—they should have sought a Permit modification, and approval of the EPA, once it was clear they could not meet the deadlines in the Permit. As determined herein, the EPA-approved Permits control over any Special Orders issued by the Board. *See infra* Part II.B.2. The selection of the means of compliance with the Permit was at the discretion of defendants, and clearly they knew they would be required to pay a considerable amount of money to achieve compliance, regardless of the means selected. That defendants will eventually achieve compliance with the Act, and spend a considerable amount of money to do so, does not excuse the fact that for years they have discharged pollutants into the Pagan River in violation of Permit No. VA0059005.

for each effluent will be determined by the court at a later juncture.[20]

B. *The 1992 Permit did not incorporate, nor was it "conditioned, revised, or superseded by," the Board's Special Orders with regard to phosphorus, TKN, CBOD, cyanide, and ammonia-nitrogen*

Defendants claim they did not violate the effluent limitations stated in the 1992 Permit because the Permit incorporated, or was "conditioned, revised, or superseded by" the Special Orders of the Board, Defs.' Br. at ii, ¶ 7, "with respect to the following pollutant parameters: phosphorus, nitrogen, CBOD, cyanide, and ammonia." Answer at 13. According to defendants, if you consider the Permit and the Special Orders together, Smithfield did not violate the effluent limits because the Board agreed to delay the commencement of the Permit's schedule of compliance in the Special Orders, including the May, 1991 Special Order.

With regard to the phosphorus limitations, defendants maintain that the May, 1991 Special Order gave them two options. Under the first option, Smithfield would agree to connect to the HRSD system within three months after a connection was made available by HRSD. In return, Smithfield alleges, the Board agreed to exempt Smithfield from the deadline for compliance with the phosphorus limitations in the Permit. The second option required Smithfield to expand or upgrade its wastewater treatment facilities to achieve compliance with the phosphorus limitations in accordance with the schedule of compliance in the Permit. Defs.' Br. at viii, ¶¶ 9y-z.

In other words, if Smithfield agreed to connect to the HRSD system, defendants contend that the May, 1991 Special Order "did not impose interim phosphorous limits or require commencement of a Schedule of Compliance." *Id.* at viii, ¶ 9y. Moreover, Smithfield's only obligation with respect to phosphorus was to connect to the HRSD system within three months of system availability. Until the connection was

available, Smithfield could not be expected to comply with the 1990 Modified Permit phosphorus limits. Compliance would only have been possible in the interim through the significant expansion of its wastewater treatment system—an expansion made moot by an agreement by Smithfield to connect to HRSD.

*Id.* Defendants claim they could not afford to connect to the HRSD *and* construct or upgrade their treatment facilities to meet the Permit's schedule of compliance. Thus, under the terms of the May, 1991 Special Order, defendants maintain that they were only required to commit to connect to the HRSD system *or* comply within the modified 1990 Permit deadlines by expanding or upgrading their treatment facilities.

According to defendants, the EPA reviewed and approved of the agreement between the Board and Smithfield that the latter would be exempt from compliance with the phosphorus effluent limits in the Permit, if Smithfield agreed to connect to the HRSD system.[21] First, the EPA approved the 1992 Permit after receiving a copy of the Board's May, 1991 Special Order, and a copy of the Board's October 10, 1991 letter stating that "[a]ny special order agreements relative to compliance with water quality standards ... take precedence over the VPDES Permit." Oct. 10, 1991 Letter from Board to Smithfield at 2, ¶ 3. Because the EPA did not notify the Board or Smithfield that it disagreed with the May, 1991 Special Order or the October, 1991 letter, defendants contend the EPA approved of it. Defs.' Br. at 13–14. Second, after the EPA received information from Smithfield indicating that defendants were following the requirements in the Special Orders, rather than those in the Permit, it also failed to indicate that defendants were doing anything wrong. Defs.' Br. at 14 & n. 9 (noting that the EPA has possession of Smithfield's DMRs in its files). Third, defendants point out that once Smithfield elected to connect to the HRSD system, the EPA indicated that it reviewed and approved of the plan when it noted that "[t]he sewer line

---

**20.** *See supra* note 18.

**21.** These arguments are also relevant to defendants' defense of estoppel, which will be addressed at *infra* Part II.C.

offers a cost effective solution for this major regional industry," Mar. 14, 1994 EPA Program Evaluation Report at 16 (Defs.' Ex. 4), and provided federal funding, via the Virginia Revolving Loan Fund Program, which was used for the HRSD upgrade and sewer connection. Defs.' Br. at ii, ¶ 3b.

In light of these facts, defendants claim they relied upon their agreement with the Board and their belief that the terms of the May, 1991 Special Order, and the agreements in the other Special Orders and letters, took precedence over the terms of the 1992 Permit. Citing *United States v. AM General Corp.*, 34 F.3d 472 (7th Cir.1994), and *United States v. Solar Turbines, Inc.*, 732 F.Supp. 535 (M.D.Pa.1989), defendants contend that a permit holder should be entitled to rely on the statements of a state agency without fear of being subjected to a federal penalty action that is actually a challenge to the permit's terms, especially when "a permit holder can see on the face of the documents memorializing the state agency's official decision that the federal government has no objection." Defs.' Br. at 12.

In *AM General*, when the EPA objected to the terms of a state-issued permit issued to a manufacturer, it forwent pursuing a direct challenge to the permit, and instead filed a civil penalty action against the manufacturer alleging violations of emissions standards promulgated under the Act. The Seventh Circuit held that the Act did not "authorize the EPA to mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been granted and the modification implemented, 28 U.S.C. § 2462, by which time a defendant would have accrued a potential liability in excess of $40 million even though it had been operating under a permit valid on its face and never before challenged." *AM General*, 34 F.3d at 475.

In *Solar*, a district court rejected the EPA's attempt to pursue an enforcement action against a permittee who was acting in accordance with its state permit. Although the EPA believed the state permit had been improperly granted, the court found the permittee had not committed a violation of the permit. Allowing the government to proceed with the action "would not only be contrary to the general enforcement scheme in the Clean Air Act, but would also lay waste to a source's ability to rely on a permit it has been issued by an authorized state permitting agency." *Solar*, 732 F.Supp. at 540.

*AM General* and *Solar* do not support defendants' argument, and they are distinguishable from this case. In those cases, the defendants complied with their permits, and the federal government objected to the terms of the permit, decided to forgo a direct challenge, and instead filed an enforcement action which in effect challenged the terms of the permit. In the case at hand, defendants have not complied with the terms of the Permit, so they cannot argue that they relied on its terms to their detriment. Moreover, unlike *AM General* and *Solar*, here the United States is enforcing—not challenging—the terms of defendants' state-issued Permit. It is the defendants who chose to forgo a direct challenge to the terms of the Permit, and who are currently challenging it by arguing that the Board's Special Orders are incorporated into, or change, the terms of the Permit.

There are two other problems with defendants' argument that they are not liable for effluent violations under the Permit because it incorporated the Board's Special Orders, which exempted them from compliance, if they elected to connect to the HRSD system. First, it is not clear that the May, 1991 Special Order exempted defendants from compliance with the phosphorus limitations in the Permit, if they elected to connect to the HRSD system. Second, even if the Special Orders provided for this exemption, in addition to the exemptions for CBOD, cyanide, and ammonia-nitrogen, and the interim limits for TKN, the Special Orders were not incorporated into, nor did they "condition, revise, or supersede," the 1992 Permit.

### 1. Exemption from compliance

██ For the effluent TKN, the Board's May, 1991 Special Order, and other Special Orders, clearly provided interim effluent limitations and monitoring requirements for Smithfield that were different from the Permit requirements. It is not clear, however,

that the May, 1991 Special Order exempted Smithfield from the January 4, 1993 deadline for full compliance with the phosphorus limitations, if Smithfield elected to connect to the HRSD system, as defendants claim.[22] Appendix A to the May, 1991 Special Order set forth interim discharge limitations and monitoring requirements for TKN, and provided that "[e]ffluent limitations and monitoring requirements for *all other* parameters and characteristics shall be those set out in the *Permit.*" (emphasis added). The May, 1991 Special Order states that Smithfield was required to comply with the interim effluent limitations in Appendix A of the Special Order, until it connected to the HRSD system or completed the approved upgrade of its treatment facilities. May 9, 1991 Special Order at 2, ¶ 4. Thus, it appears that Smithfield was required to comply with the limitations in the Permit for all effluents, except TKN. The court is unable to find in the May, 1991 Special Order any specific or express statement by the Board that Smithfield was not required to achieve full compliance with the phosphorus limitations by January 4, 1993, if it elected to connect to the HRSD system.

Moreover, on October 1, 1991, Smithfield indicated in a letter to the Board that it did not believe the May, 1991 Special Order specifically relieved it from compliance with the limitations in the Permit: "[r]elief from such compliance [with the effluent limitations in Part I.C. of the draft 1991 Permit, which included a phosphorus limitation required to be achieved by January 4, 1993,] *is not specifically present or is not apparent in the [1991] Consent Order.*" Oct. 1, 1991 Letter from Smithfield to Board at 3 (emphasis added). Although defendants sought reassurance from the Board, in the form of "some documentation or letter," that they were relieved from compliance with the effluent limitations in the Permit if they agreed "to connect to HRSD as soon as it

becomes available regardless of the time frame in which it occurs," *id.*, the Board did not do so in its response. Instead, the Board indicated that the Permit deadlines were still applicable to defendants when it stated, *inter alia,* that "[t]he compliance schedules and related goal dates contained in the permit are there to afford the permittee necessary time to comply with the established effluent limitations." Oct. 10, 1991 Letter from Board to Smithfield at 2, ¶ 3. Thus, neither the Board's May, 1991 Special Order, nor its October 10, 1991 letter, clearly exempted defendants from the January 4, 1993 deadline for full compliance with the phosphorus limitations, if defendants elected to connect to the HRSD system.

In addition, defendants' current interpretation of the Board's May, 1991 Special Order and October 10, 1991 letter does not make sense when one considers the fact that *after* Smithfield agreed to the HRSD connection on June 7, 1991, the 1992 Permit issued by the Board *included* the January 4, 1993 deadline for phosphorus compliance, and a May 13, 1994 deadline for CBOD, cyanide, and ammonia-nitrogen compliance. It would be illogical for the Board to include deadlines in a 1992 Permit which are no longer applicable to Smithfield after June 7, 1991, as defendants contend. Defendants boldly assert that the deadlines "merely provided the official point of reference that would be needed in case Smithfield reneged on its commitment to make the HRSD connection." *Id.* at xii, ¶ 9nn. Nothing in the 1992 Permit, or the entire record, supports this contention. On the contrary, the Board's inclusion of these deadlines in the 1992 Permit, and the absence of any clear statement in the May, 1991 Special Order that defendants were exempt from the schedule of compliance for phosphorus, if they decided to connect to the HRSD system, points to the fact that neither the May, 1991 Special Order, nor any other

---

**22.** In the May, 1991 Special Order, the Board required Smithfield to notify the Board no later than June 15, 1991, of defendants' commitment "to connect to the HRSD line or to upgrade their facilities to comply with the 2 milligram per liter phosphorus standard." May 9, 1991 Special Order at 2. According to defendants, they were therefore required to choose between the following two options: (1) "connect to HRSD line" or

(2) "upgrade their facilities to comply with the 2 milligram per liter phosphorus standard." Defs.' Br. at viii–ix, ¶¶ 9x–9cc. Another way to read this sentence, however, is that defendants were required to "comply with the 2 milligram per liter phosphorus standard," either by (1) connecting to the HRSD line or (2) upgrading their facilities.

Special Order or letter, relieved defendants from compliance with the January 4, 1993 deadline in the Permit for the phosphorus limitations.[23]

The Board did provide an exemption, however, for the CBOD, cyanide, and ammonia-nitrogen limitations in the November 8, 1994 amendment to the May, 1991 Special Order. After the 1992 Permit was issued, and after the May 13, 1994 deadline for compliance with the CBOD, cyanide, and ammonia-nitrogen limits had passed without full compliance by defendants, the Board issued an amendment to the May, 1991 Special Order on November 8, 1994, in which it agreed that defendants "may achieve compliance with [the permit effluent limitations for CBOD, total cyanide, and ammonia-nitrogen] by connecting to the HRSD system." Nov. 8, 1994 Special Order at 1. The Board further decided "to hold in abeyance the requirement in Part I.D.6. of the Permit for Smithfield to comply with these effluent limitations by May 13, 1994," and agreed that "this amendment does not alter, modify, or amend any other term or condition of the Order or of the Permit except as specified above." *Id.* at 1–2. Although these Special Orders may have included different requirements for TKN, CBOD, total cyanide, and ammonia-nitrogen, defendants are still liable for Permit violations for these effluents, unless the Special Orders actually changed the terms of the 1992 Permit.

### 2. The Special Orders did not change the terms of the Permit

Defendants admit that the May 9, 1991 Special Order provides that "[n]othing herein shall be construed as altering, modifying, or amending any term or condition contained in VPDES Permit No. VA 0059005." May 9, 1991 Special Order at 2; *see* Defs.1 Br. at xv, ¶ 20 (admitting sentence four of ¶ 20 of Pl.'s Facts). Defendants claim, however, that they are not arguing that the Special Orders altered, modified, or amended the Permit— they claim the Special Orders were incorporated into, or "conditioned, revised, or super-

seded," the 1992 Permit. Defs.' Br. at ii, ¶ 7. Regardless of the semantics, for the purposes of this motion, the court must determine whether the terms of the 1992 Permit, or defendants' obligations under the 1992 Permit with regard to the EPA, were changed in any way by the Board's Special Orders or letters. There is no evidence to suggest that the Special Orders or letters were incorporated into, or that they conditioned, revised, superseded, altered, modified, amended, or changed the terms of the 1992 Permit, or defendants' obligations under the Permit.

■ With regard to the Board's Special Orders and letters dated *after* the issuance of the 1992 Permit, there is no evidence in the record that they changed the terms of the 1992 Permit or defendants' obligations under the Permit. First, there is no evidence that defendants ever followed the specific, mandatory procedures for modification of a Permit. *See* 40 C.F.R. § 122.62; *see also Citizens for a Better Environment–California v. Union Oil Co. of California*, 83 F.3d 1111, 1119 n. 7 (9th Cir.1996) (finding that a cease and desist order did not modify the terms of the permit because it was undisputed that the permit modification procedures were not followed), *cert. denied,* —— U.S. ——, 117 S.Ct. 789, 136 L.Ed.2d 731 (1997). Second, the Virginia statute cited by the Board for its authority in the Special Orders does not authorize permit modification; rather, it authorizes the Board to, *inter alia,* "issue special orders to owners (i) who are permitting or causing the pollution ... of state waters to cease and desist from such pollution...." Va.Code § 62.1–44.15(8a). Accordingly, because defendants did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures, defendants cannot support their argument that the Special Orders or letters issued by the Board after the 1992

---

**23.** While the Board did defer the commencement of the schedule of compliance for the phosphorus limitations in its March, 1990 and November, 1990 Special Orders, the entire schedule for phosphorus compliance, or the January 4, 1993 deadline, was not deferred in the March, 1990 and November, 1990 Special Orders. *See supra* note 4.

Permit modify the terms of the Permit or bind the EPA.[24]

■ The Board's Special Orders or letters dated *before* the issuance of the 1992 Permit cannot logically change the terms of a more recent Permit approved by the Board and the EPA. The 1992 Permit was issued after the May, 1991 Special Order and the October 10, 1991 letter. Consequently, these documents, and any other Special Orders or letters of the Board dated prior to January 3, 1992, cannot change the terms of the 1992 Permit.

■ Moreover, the court does not agree with defendants that the EPA "incorporated" the Boards' May, 1991 Special Order and October 10, 1991 letter into the 1992 Permit, and approved of the agreement between the Board and Smithfield, when it failed to object to the content of these documents before approving the 1992 Permit, and when it failed to object after receiving information from defendants indicating they were violating the terms of the Permit, but not the terms of the Special Orders. The EPA's silence with regard to the agreement between Smithfield and the Board does not indicate its approval, especially when the EPA was not asked to review and approve of Smithfield's agreement with the Board.[25]

■ Furthermore, even if the EPA indicated approval of the HRSD–Smithfield connection when it stated it was a "cost effective solution," and provided funding through the Virginia Revolving Loan Fund Program for the HRSD upgrade and sewer extension,[26] this does not mean that the EPA approved of the timetable for compliance allegedly established by the Board, *i.e.*, that upon deciding

to connect to the HRSD, Smithfield no longer had to comply with the limitations in the Permit, but was only required to connect to the HRSD within three months of its availability, regardless of when the connection became available.

Even if defendants thought in good faith that the United States was bound by the agreements in the Special Orders and letters of the Board, the United States is not bound unless it is a party to those agreements or it consents to be bound. *See United States v. Atlas Powder Co.*, 26 Env't Rep. Cas. (BNA) 1391, 1392 (E.D.Pa.1987) (Pl.'s Ex. 31) (where explosives manufacturer had good faith belief that United States was bound by terms of a consent decree between environmental group and manufacturer, court held that United States was not subject to liability for manufacturer's attorneys' fees and costs in negotiating settlement with the group). The court in *Atlas Powder* noted that

> [t]here is no authority for the proposition that the United States has an affirmative duty to notify a potential defendant that it does not intend to be bound by any consent decree entered into by the defendant and a private party, or by the defendant and the Commonwealth. *The United States is not bound by the settlement agreements or judgments in cases to which it is not a party.*

*Id.* (emphasis added).

■ In the case at hand, the United States was not a party to the agreements between the Board and Smithfield, and it never affirmatively agreed to be bound by the Board's Special Orders and letters. Decl. of Reynolds ¶ 13. Thus, the Special

---

**24.** If the court allowed the terms of a Permit to be modified by special orders or interpretive letters issued by the state, which are not subject to EPA approval, this would undermine the EPA's ability to enforce the Act. In the Act, Congress gave the EPA authority to approve of and enforce permits, and to set specific regulatory guidelines for the modification of permits. States and permittees should not be allowed to circumvent the Act by issuing consent orders or interpretive letters which are binding on the EPA without its consent or approval.

**25.** This conclusion of the court is also addressed in the estoppel section. See *infra* Part II.C.

**26.** It is not clear to what extent the EPA reviewed or approved of the HRSD–Smithfield connection. The United States contends that while the EPA may require a state to refund monies loaned in violation of the financial restrictions set forth in a state revolving fund agreement, the EPA cannot approve or disapprove of a particular project—it is the state that oversees the individual projects. Pl.'s Br. at 9 (citing 55 Fed.Reg. 10176 (Mar. 19, 1990) and 40 C.F.R. part 35).

Orders and letters of the Board have no binding effect on the United States. This fact is true even though the EPA received copies of the Special Orders and letters, and failed to indicate its disapproval. *See United States v. Ohio Edison Co.*, 725 F.Supp. 928 (N.D.Ohio 1989) (holding that the United States did not "waive any objection" to the state's suspension of a construction schedule when the EPA failed to object or oppose the action, because "[s]ending a copy of the letter to the [EPA] ... is not equivalent to the procedural requirements set forth in 40 CFR 123.44 or Section 402(d) of the Act, which allow the Administrator of the [EPA] to veto a state's issuance of a permit").

Defendants next argue that the Board's contemporaneous interpretations of defendants' obligations under the Permit and Special Orders are entitled to greater deference than explanations made after-the-fact. Defs.' Br. at 10 n. 4; *see SSM Rehabilitation Institute v. Shalala*, 68 F.3d 266, 270 (8th Cir. 1995) (an "agency's contemporaneous interpretation of its own regulation is entitled to greater deference" than an explanation made by that same agency "after-the-fact") (citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). According to defendants, the Board's contemporaneous interpretation is that the May 9, 1991 Special Order exempted them from phosphorus compliance, if they chose the HRSD connection, and this Special Order took precedence over the terms of the 1992 Permit. In 1991, Smithfield asked the Board whether the draft 1992 Permit was imposing the January 4, 1993, compliance date for phosphorous standards and therefore ignoring the 1991 Special Order. *See* Oct. 1, 1991 Letter from Smithfield to Board at 3. The Board responded that "[t]he draft permit is a separate document from the current Consent Special Order issued to Smithfield Foods in May 1991" and noted that "[a]ny special order agreements relative to compliance with water quality standards" approved by the Board would "take precedence over the VPDES Permit." Oct. 10, 1991 Letter from Board to

Smithfield at 2, ¶ 3. While the Board does state here that the agreements in the Special Orders take precedence over the Permit, the text of this letter contradicts defendants' assertion that the Permit incorporated the Special Orders, as the Board considered the Permit and Special Orders to be "separate document[s]." *Id.* Even if this court opined that the EPA was bound by the Board's statement that the Special Orders "take precedence" over the Permit, which it does not, the court has already determined that the May, 1991 Special Order did not exempt defendants from the phosphorus compliance deadlines, if they elected to connect to HRSD.[27] Thus, the court disagrees with defendants that "[t]he clear import of the Board's response [in the October 10, 1991 letter] is that so long as Smithfield remained committed to connecting to HRSD, the Permit terms were superseded by the terms of the 1991 Order and that Smithfield would comply with the 1992 Permit so long as it satisfied the terms of the 1991 Order." Defs.' Br. at 11.

Other statements by the Board contemporaneous with the issuance of the 1992 Permit indicate that defendants were still required to comply with its terms. On December 23, 1991, after the May 9, 1991 Special Order was issued, the Board reported to the EPA that defendants' discharge was "expected to meet the required effluent limitations." Dec. 23, 1991 Memorandum Accompanying 1992 Permit at 4. Later, on May 15, 1992, the Board sent a letter to Smithfield reminding it that "the deadline for achieving final effluent limitations [for CBOD, total cyanide, and ammonia-nitrogen] is May 13, 1994." May 15, 1992 Letter from Board to Smithfield. The Board further stated that "[s]hould construction be delayed such that this deadline may be missed, a modification to the existing Consent order should be requested." *Id.* Consequently, the court concludes the Board's contemporaneous interpretation of the 1992 Permit was that defendants were "expected to meet the required final effluent limita-

---

27. *See supra* Part II.B.1. In addition, as noted previously, defendants' own contemporaneous interpretation of the May, 1991 Special Order is that relief from compliance with the schedule in the 1992 Permit "is not specifically present or is not apparent in the [1991] Consent Order." Oct. 1, 1991 Letter from Smithfield to Board at 3.

tions" in the 1992 Permit for phosphorus, TKN, CBOD, total cyanide, ammonia-nitrogen, and the other effluents.[28]

In conclusion, the Board's Special Orders did not change the terms of the 1992 Permit, nor did the 1992 Permit implicitly incorporate any agreements set forth in the Special Orders. This is true notwithstanding the fact that the EPA failed to object to the alleged agreement between the Board and Smithfield even though it had copies of the Board's May, 1991 Special Order and October 10, 1991 letter, and information about defendants' noncompliance with the Permit. Defendants never explicitly asked the EPA to approve of their agreement with the Board, and the EPA's failure to comment on this agreement did not endorse the agreement. If defendants wanted to extend the deadline for full compliance for phosphorus, CBOD, total cyanide, and ammonia-nitrogen, or obtain different effluent limitations for TKN, they should have done so by seeking a permit modification. Since the 1992 Permit was not modified, defendants were still required to follow the TKN limitations in the 1992 Permit, and the schedule of full compliance for phosphorus, CBOD, cyanide, and ammonia-nitrogen limitations in the 1992 Permit, or subject themselves to liability for permit violations.[29]

## C. Estoppel

■ Defendants contend that the United States is not entitled to summary judgment because it is estopped from enforcing the limitations in the Permit. Estoppel against the United States is permitted, however, only in the most extraordinary circumstances. *Heckler v. Community of Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The United States is only estopped from enforcing the Permit if defendants prove: (1) the traditional elements of estoppel are present, *id.* at 61, 104 S.Ct. at 2224–25; (2) the United States has engaged in affirmative misconduct, *I.N.S. v. Miranda*, 459 U.S. 14, 17, 103 S.Ct. 281, 282–83, 74 L.Ed.2d 12 (1982); and (3) the circumstances are such that "the public interest in ensuring that the [United States] can enforce the law free from estoppel might be outweighed by the countervailing interest of [the private party]." *Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224. As defendants have not satisfied the second element required for estoppel against the United States—affirmative misconduct—the court declines to address the other elements.

■ According to defendants, the United States is estopped from enforcing the limitations in the Permit because the "EPA has been aware for many years of the Board's Special Orders revising Smithfield's obligations," and "[d]iscovery to date demonstrates that the United States acted affirmatively." Defs.' Br. at 15. As discussed in the last section, there is no evidence whatsoever

28. It was not until two years after the issuance of the 1992 Permit that the Board clearly agreed "to hold in abeyance the requirement in Part I.D.6. of the Permit for Smithfield to comply with [final effluent limitations for CBOD, total cyanide, and ammonia-nitrogen] by May 13, 1994." November 8, 1994 Special Order at 1. However, as already discussed herein, the United States is not bound by the Board's Special Orders issued after the 1992 Permit because the Special Orders did not modify the Permit, and because the United States never agreed to be bound by them. *See supra* at 46–51.

29. Defendants claim that the United States should not seek penalties against defendants because "the federal government itself pursues a policy similar to that pursued by Virginia in this case when it sees fit" and they note that the Supreme Court has recognized that the Administrator of the EPA may issue compliance orders under Section 309(a) of the Act, 33 U.S.C.

§ 1319(a), agreeing "not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 61, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987) (Congress did not intend to allow citizens to file suit against a violator, months or years later, "in order to seek the civil penalties that the Administrator chose to forgo," because this would considerably curtail the Administrator's discretion to enforce the Act in the public interest); *see* Defs.' Br. at 2. Notwithstanding the fact that the EPA may forgo seeking civil penalties with regard to other violators, this does not prevent the EPA from seeking them when the EPA deems that other methods of enforcement are not achieving compliance with the Act in a timely manner, as in this case.

indicating that the EPA ever affirmatively stated to defendants that they were not obliged to comply with the Permit requirements; that the Special Orders changed, or were incorporated into, the Permits; that the EPA agreed to be bound by the Board's Special Orders or letters; or that the EPA approved of the Board's alleged agreement with Smithfield, namely that the latter did not have to comply with the schedule of compliance in the Permit, if it elected to connect to the HRSD, regardless of when this connection occurred.[30] Inaction or passivity of the EPA is not affirmative misconduct with respect to defendants' violations. Thus, because defendants have failed to present any evidence of affirmative misconduct by the EPA, they are not entitled to the defense of estoppel against the United States.

*D. Claims for civil penalties and injunctive relief are not · barred by Section 309(g)(6)(A)(ii) of the Clean Water Act*

■ Defendants assert that the United States' claims for civil penalties and injunctive relief[31] are barred by Clean Water Act § 309(g)(6)(A)(ii), § 309(g)(6)(A)[32] because for the last ten years the Commonwealth, by issuing Special Orders, has commenced and is diligently prosecuting an administrative action against Smithfield under Virginia law that is comparable to Section 309(g). Since Section 309(g)(6)(A) only applies to civil penalty actions, the court finds that the United States' claim for injunctive relief is not barred by this section. *Coalition for a Liveable West Side, Inc.* v. *New York City Department of Environmental Protection,* 830 F.Supp. 194, 196 (S.D.N.Y.1993). Section 309(g)(6)(A)(ii) of the Act does bar the United States from bringing a civil penalty action for "any violation" whenever a state enforcement agency has "commenced and is diligently prosecuting an action under a State law

comparable to this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii).

■ Rather than include a penalty provision in each subsection of the Virginia statute, as Congress did in the Clean Water Act, Virginia simply created a single penalty provision to govern all violations of Virginia's State Water Control Law. See Va.Code § 62.1–44.32. Therefore, the United States urges the court to compare Section 309(g) to the specific code section cited by the Commonwealth as its authority for issuing the Special Orders, Virginia Code § 62.1–44.15(8a), which contains no specific penalty provision. However, this court agrees with defendants that it should compare Section 309(g) to the *entire* state enforcement scheme. *See, e.g., North and South Rivers Watershed Ass'n. Inc.* v. *Town of Scituate,* 949 F.2d 552, 555–56 (1st Cir.1991) (court should focus on whether the entire statutory scheme is comparable to the entire Clean Water Act, rather than the individual section of state law, when determining whether a citizen suit is barred); *Connecticut Coastal Fishermen's Ass'n* v. *Remington Arms Co.. Inc.,* 777 F.Supp. 173, 182 (D.Conn.1991) (same), *rev'd in part on other grounds,* 989 F.2d 1305 (2nd Cir.1993). *But see Union Oil,* 83 F.3d at 1118 ("the penalty at issue must have been assessed under that provision of the state law that is comparable to [Section 309(g) ]"); *Molokai Chamber of Commerce* v. *Kukui (Molokai), Inc.,* 891 F.Supp. 1389, 1404 (D.Haw.1995) (same)

The proper focus in determining comparability is on the substance of the law, not its form; the comparability determination should not turn on "the logistical happenstance of statutory drafting." *Scituate,* 949 F.2d at 556. Accordingly, because the court will not elevate form over substance when determining if the state and federal laws are

---

**30.** *See supra* Part II.B.2.

**31.** In their Answer, defendants initially only allege that the claims for civil penalties are barred by this section. In their response to the United States' motion, however, they state that the claims for injunctive relief are also barred. Defs. Br. at 27 n. 19.

**32.** Although defendants also cite Section 309(g)(6)(A)(iii) 33 U.S.C. § 1319(g)(6)(A)(iii), in their Answer, the United States' suit *is* clearly not barred by this section, which applies only if "the violator has paid a penalty assessed under [Section 309(g) ], or such comparable State law, as the case may be." Defendants do not even allege that they have paid any such penalties, and there is no evidence to this effect.

comparable, it will consider whether Virginia's entire enforcement scheme is comparable to Section 309(g).

### 1. Authority to impose administrative penalties

■ The United States contends that Virginia law is not comparable to Section 309(g) because it does not provide the Commonwealth with the authority to impose administrative penalties.[33] Section 309(g)(6)(A)(ii) only bars a civil penalties action when a state has commenced and is diligently prosecuting an action under a state law *comparable* to Section 309(g). Section 309(g) is entitled "Administrative penalties," and it *authorizes* the EPA to assess *administrative penalties* for violations of the Act or a permit condition or limitation. Accordingly, a state law is only comparable to Section 309(g), if it *authorizes* the state to assess *administrative penalties* for violations of the Act or of a permit.[34] *See, e.g. Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380–81 (8th Cir.1994) ("comparability requirement may be satisfied so long as the state law contains comparable penalty provisions which *the state is authorized to enforce*," along with other provisions) (emphasis added), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995); *Scituate*, 949 F.2d at 556 (finding Massachusetts statutory scheme comparable where it "authorized" the Massachusetts Department of Environmental Protection to assess penalties in a manner similar to Section 309(g) of the Federal Act, even though penalties were not actually sought); *Orange Environment, Inc. v. County of Orange*, 860 F.Supp. 1003, 1014 (S.D.N.Y.1994) (finding New York law comparable to the Act's administrative penalty provisions because "penalties may also be assessed by the Commissioner in the first instance which are subject to review" by a court); *Remington Arms*, 777 F.Supp. at 181

(Section 309(g)(6)(A)(ii) "bars citizen suits where a state agency conducting enforcement proceedings has authority to assess civil penalties, regardless of whether the agency has actually assessed such penalties."); *New York Coastal Fishermen's Ass'n v. New York City Dep't of Sanitation*, 772 F.Supp. 162, 165 (S.D.N.Y.1991) (noting that New York law allows the state to "seek penalties for violations" of New York's Environmental Conservation Law, but the state is not required to impose penalties for a citizen suit to be precluded).

Virginia law provides for the imposition of "civil charges" *only when the violator consents*. Va.Code § 62.1–44.15(8d) ("With the consent of any owner who has violated or failed, neglected or refused to obey any regulation or order of the Board" or any permit condition, "the Board may provide, in an order . . ., for the payment of civil charges for past violations" in specific sums.).[35] A penalty provision requiring the consent of the violator does not have the same "teeth" to encourage enforcement as Section 309(g). As noted by the Supreme Court in *Tull v. United States*, 481 U.S. 412, 422–23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987), civil penalties are very important in the Act's enforcement scheme, as they punish violators, deter violations, and disgorge economic profits derived from the violations.

Although the court recognizes that it is important to grant state enforcement agencies latitude to pursue the remedies they deem most effective in furthering the goals of the Clean Water Act, a state law must be comparable to the administrative penalty provision of the Clean Water Act, Section 309(g), for it to preclude a civil penalty action under Section 309(g)(6)(A)(ii). Virginia law, *requiring the consent of the violator to the penalties, does not authorize the imposition*

---

**33.** The United States also notes that the Board's Special Orders have not required defendants to pay any penalties. *See supra* note 32.

**34.** Although the court agrees with defendants that the Commonwealth does not have to seek or impose administrative penalties, *see* Defs.' Br. at 16, Virginia law must still *authorize* the Commonwealth to pursue *administrative penalties— not* just judicial penalties—for the state law to be

comparable to Section 309(g), and consequently bar the United States' action for civil penalties under Section 309(g)(6)(A)(ii). *See infra* note 35.

**35.** Virginia Code § 62.1–44.15(8c) does authorize the Board to pursue civil penalties *in a court of law* under Virginia Code § 62.1–44.32, *but this is a judicial rather than an administrative penalty.*

*of administrative penalties* in a manner comparable to Section 309(g). Accordingly, the United States is not barred herein from bringing an independent penalty action against defendants.

### 2. Public notice and participation

■ Numerous courts have also found that a state law is only comparable to Section 309(g), if it contains public notice and participation rights that are similar to Section 309(g). *See. e.g., California Sportfishing Protection Alliance v. City of West Sacramento,* 905 F.Supp. 792, 804 (E.D.Cal.1995) (finding California law comparable to Section 309(g) because it has public participation procedures closely analogous to each of the provisions in Section 309(g)(4)); *Save Our Bays and Beaches v. City and County of Honolulu,* 904 F.Supp. 1098, 1133 (D.Haw.1994) (state statutes and regulations which do not contain mandatory safeguards of public notice and participation cannot be deemed comparable to Section 309(g)); *Public Interest Research Group of New Jersey, Inc. v. New Jersey Expressway Authority,* 822 F.Supp. 174, 184 (D.N.J.1992) (finding state law not comparable because the statutes and regulations did not afford the public notice and opportunity to comment or participate in a hearing, like Section 309(g)(4)); *Natural Resources Defense Council, Inc. v. Vygen Corp.,* 803 F.Supp. 97, 101 (N.D.Ohio 1992) (Ohio law, which contained discretionary notification and participation provisions, was not comparable to Section 309(g) because it did not contain mandatory public participation safeguards); *Public Interest Research Group of New Jersey, Inc. v. GAF Corp.,* 770 F.Supp. 943, 950–51 (D.N.J.1991) (state law that did not provide public notice, or provide the public an opportunity to comment or request a hearing on a proposed administrative consent order, was not comparable); *Atlantic States Legal Foundation, Inc. v. Universal Tool and Stamping Co., Inc.,* 735 F.Supp. 1404, 1415–16 (N.D.Ind.1990) (state law not comparable where it failed to require notice of matters concluded by consent decree, and did not provide a reasonable opportunity to comment on a proposed penalty assessment or to obtain judicial review of administrative orders similar to Section 309(g)(8)). *But see ICI Americas,* 29 F.3d at 381 (agreeing with *Scituate,* and holding state law comparable where it provided an ex post facto right to intervene, no public notice at any time, and no opportunity to comment on a proposed consent order); *Scituate,* 949 F.2d at 556 n. 7 ("So long as the provisions in the State Act adequately safeguard the substantive interests of citizens in enforcement actions, the rights of notice and public participation found in the State Act are satisfactorily comparable to those found in the Federal Act.").

■ Congress provided for the "rights of interested persons" in Section 309(g)(4) of the Act, 33 U.S.C. § 1319(g)(4). Although a state's statutory or regulatory scheme need not be identical to the federal government's to be "comparable," the state law must provide public notice and participation safeguards similar to those in Section 309(g) to ensure that interested citizens have an opportunity to contest administrative actions. These safeguards include: (1) "public notice and reasonable opportunity to comment on the proposed issuance of an order," Section 309(g)(4)(A), 33 U.S.C. § 1319(g)(4)(A); (2) the right of persons who commented on the proposed penalty assessment to "notice of any hearing held under this subsection and of the order assessing such penalty," Section 309(g)(4)(B), 33 U.S.C. § 1319(g)(4)(B); (3) if a hearing is held, the commentators have a right to receive "a reasonable opportunity to be heard and to present evidence," *id.;* (4) if a hearing is not held, the commentators may petition the EPA to set aside the order and provide a hearing, Section 309(g)(4)(C), 33 U.S.C. § 1319(g)(4)(C); (5) if a hearing is denied, the EPA must provide notice of and the reasons for the denial, *id.;* and (6) the commentators have a right to appeal an administrative penalty assessment in United States District Court. Section 309(g)(8), 33 U.S.C. § 1319(g)(8).

With regard to public notice and opportunity to comment, Virginia's regulations provide that the Board will investigate and respond to citizen complaints concerning matters within the Board's purview. Va. Admin. Code tit. 9 § 25–31–910(B)(1). The regulations further provide that

[a]t least 30 days prior to the final settlement of any civil enforcement action or the issuance of any consent special order, the board will publish notice of such settlement or order in a newspaper of general circulation in the county, city or town in which the discharge is located, and The Virginia Register of Regulations....

*Id.* § 25–31–910(B)(3). The regulations also require the Board to consider all comments received during this thirty-day period before taking final action. *Id.* The United States concedes that the November, 1994 Special Order was published for public comment, as required by Title 9 of Virginia Administrative Code § 25–31–910(B)(3). *See* Pl.'s Br. at 26 n. 19.

With regard to public participation in hearings, there are two types of administrative hearings in the Virginia Administrative Code, informal hearings, referred to as "public hearings," and "formal hearings." Va. Admin. Code tit. 9 § 25–230–10. "Public hearings" are informal fact-finding proceedings "held to afford interested persons an opportunity to submit factual data, argument and proof to the board." *Id.* § 25–230–30. A permit applicant, permittee, or any person may request a public hearing when the Board considers whether to issue, deny, modify, or revoke a permit. *Id.* § 25–230–40. Any person aggrieved by any action or inaction of the Board with respect to a permit or arising out of the public hearing procedures may petition the Commonwealth for a "formal hearing." *Id.* § 25–230–130.

"A formal hearing is a public proceeding for the taking of evidence ... " *Id.* § 25–230–100. "A formal hearing may be held to consider appeals of certain actions of the board ... taken without a formal hearing," and "must be held prior to the issuance of a special order ... unless the owner consents to the issuance of a special order without a hearing." *Id.*[36] If the owner does not consent to the issuance of a special order without a formal hearing, and a formal hearing is held, "the only party to a special order hearing shall be the proposed recipient of the special order." *Id.* § 25–230–120.

Thus, it appears that, under Virginia law, a citizen can petition for either a public or formal hearing, only if the grievance is with respect to an action or inaction of the Board in issuing, denying, modifying, or revoking a permit. However, *a grievance with the issuance of a special order is not a permit grievance.* There appears to be no provision allowing a citizen to petition for either a public (informal) hearing, or formal hearing, if a citizen has a grievance with respect to the proposed issuance of a special order. Moreover, a formal hearing regarding the proposed issuance of a special order may never be held because the recipient of that special order can waive the formal hearing. Then, even if a formal hearing is held regarding the proposed issuance of a special order, the only party at that special order hearing is the recipient of that special order.

In this case, Smithfield consented to the issuance of the Special Orders without a hearing, and there was no opportunity for the public to request a hearing prior to their issuance. Defendants maintain that a state law need not provide hearings in all cases to be comparable to Section 309(g), because even Section 309(g)(4) does not require a hearing—it only allows interested persons to comment, if a hearing is held, or petition the EPA for a hearing, if one is not held. Section 309(g)(4)(C), however, does require "notice of and the reasons for" the denial of a hearing. Virginia law, which allows the violator to waive a formal hearing, does not contain similar provisions protecting the public's right to request a hearing prior to issuance of a special order, to be heard and present evidence if a hearing is held on the proposed issuance of a special order, and to obtain an explanation if a hearing is not held.

In addition, at the time the Special Orders were issued, there was also no Virginia law counterpart to the public's opportunity to obtain judicial review under Section 309(g)(8). Although any violator "aggrieved by a final decision of the Board" under 62.1–44.15(8a) was "entitled to judicial review," Va.Code § 62.1–44.29 (1992 Replacement

---

**36.** "A consent special order is a special order issued without a public hearing and with the written consent of the affected owner." Va. Admin. Code tit. 9 § 25–31–910(B)(3).

Volume), Virginia law provided no similar right to any other persons. *Town of Fries v. State Water Control Board,* 13 Va.App. 213, 216, 409 S.E.2d 634 (1991).[37]

Virginia law does provide the public with notice and some opportunity for comment, but the court finds that Virginia law at the time of the issuance of the Special Orders did not include public participation provisions sufficiently comparable to Section 309(g). Unlike Section 309(g), Virginia law did not grant the public a right to request a hearing prior to issuance of a special order, to be heard at a hearing regarding the proposed issuance of a special order, to obtain reasons for denial of a hearing, or to seek judicial review of a special order. Consequently, this court does not find Virginia's public participation procedures at the time of the issuance of the Special Orders to be sufficiently similar to Section 309(g).[38]

In conclusion, Virginia's entire enforcement scheme is not comparable to Section 309(g) because it does not provide authority to issue administrative penalties and because it failed, at the time of the Special Orders, to provide adequate procedures for public participation. Because the court concludes that Virginia law is not comparable to Section 309(g), and thus does not bar the United States from pursuing an independent penalty action against defendants, the court need not address whether the Commonwealth is diligently prosecuting an administrative action against defendants.

*E. Phosphorus claims not precluded by Section 510 of the Act*

█ In their response to the United States' motion, defendants contend that Section 510 of the Act, 33 U.S.C. § 1370, precludes federal enforcement of the United States' phosphorus-based claims. The court agrees with the United States that this argument "is completely unsupported by the language of Section 510 and flatly inconsistent with the language, intent, and structure of Sections 309(a) and 301 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1311." Pl.'s Rebuttal at 16.

Section 510 of the Act states that the Act does not preclude or deny the right of any state to adopt or enforce standards, limitations, or requirements that are more stringent than federal law. 33 U.S.C. § 1370(1)(A) and (B). The Commonwealth of Virginia has adopted stricter standards, limitations, and requirements for the discharge of phosphorus than required by the Act, and it included these phosphorus limitations in defendants' Permit. In filing this action alleging violations of the phosphorus limits, defendants contend that the United States is contravening "the clear mandate of Section 510 by denying Virginia its right to enforce without federal interference more stringent state standards and requirements than it created itself." Defs.' Br. at 29. The court disagrees.

The Commonwealth's phosphorus limitation, which is a standard within the meaning of Section 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C), was incorporated into defendants' NPDES Permit issued pursuant to Section 402, 33 U.S.C. § 1342. Defendants admit that the EPA has the authority to enforce a more stringent state effluent standard incorporated into a permit approved by the EPA. Defs.' Br. at 29 (citing 33 U.S.C. § 1319(a)(1) and (3)). Thus, because the plain language of Section 309(a)(1) and (3), 33 U.S.C. § 1319(a)(1) and (3), clearly provides that the United States may enforce the phos-

**37.** After the Fourth Circuit in *Commonwealth of Virginia v. Browner,* 80 F.3d 869 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 764, 136 L.Ed.2d 711 (1997), upheld the EPA's disapproval of the citizen standing provisions of the Virginia Code, the Commonwealth amended Section 62.1–44.29 of the Virginia Code in 1996. This amendment, effective January 1997, now allows the violator *and* "any person who has participated, in person or by submittal of written comments" to appeal a special order. Supplement to January 6, 1995 Virginia Attorney General's Opinion at 2, 5 (dated Feb. 6, 1997) (Pl.'s Ex.

26). Because this amendment was not in effect when the Special Orders were issued, or when this Complaint was filed, it is not relevant to the court's determination of whether the state law was comparable to federal law at the time of the state's enforcement action.

**38.** This conclusion is consistent with Congress' intent to provide for, encourage, and assist the participation of the public in the enforcement of the Act. Section 101(e), 33 U.S.C. § 1251(e).

phorus standard in defendants' Permit, the court concludes that Section 510, 33 U.S.C. § 1370, does not preclude the United States from pursuing their phosphorus-based claims against defendants in this action.

### III. Conclusion

As a matter of law, the court GRANTS partial summary judgment to the United States against defendants for several reasons. First, defendants are liable for violations of Clean Water Act § 309(b) and (d), 33 U.S.C. § 1319(b) and (d). Specifically, Smithfield Foods is liable for at least 164 days of violations of the reporting requirements of Permit No. VA0059005 (Count V); and defendants Smithfield Foods, Smithfield Packing, and Gwaltney are liable for any violations of the effluent limitations contained in Permit No. VA0059005 for: phosphorus, ammonia-nitrogen, TKN, fecal coliform, minimum pH, cyanide, oil and grease, CBOD, BOD, and total suspended solids (Counts I–IV). Second, Permit No. VA0059005 did not incorporate, nor was it conditioned, revised, or superseded by, the Board's Special Orders issued prior to the filing of this action. Third, the United States' claims are not barred by estoppel. Fourth, the United States' claims are not barred by Clean Water Act § 309(g)(6)(A), 33 U.S.C. § 1319(g)(6)(A). Fifth, the United States' phosphorus claims are not precluded by Clean Water Act § 510, 33 U.S.C. § 1370.

The Clerk is DIRECTED to send a copy of this Opinion to counsel for the parties.

It is so ORDERED.